# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

SHOZDIJIJI SHISINDAY,                    §
a/k/a DANNY DEAN THOMAS,                  §
                                         §
            *Petitioner*,                §
                                         §
v.                                       §          CIVIL ACTION NO. H-06-814
                                         §
NATHANIEL QUARTERMAN,                    §
                                         §
            *Respondent*.                §

## MEMORANDUM AND ORDER

On March 9, 2006, appointed counsel for Shozdijiji ShisInday ("ShisInday")[1] filed a

federal petition for a writ of habeas corpus on his behalf. (Docket Entry No. 1). Counsel

later filed an amended petition. (Docket Entry No. 18). This action comes before the Court

on Respondent Nathaniel Quarterman's answer and motion for summary judgment. (Docket

Entry No. 21). ShisInday has responded to the answer, both through counsel and in a *pro se*

pleading. After reviewing the pleadings, the record, and the applicable law – particularly the

application of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") – the Court

**GRANTS** Respondent's summary judgment motion, **DENIES** ShisInday's petition, and

**DISMISSES** this case. The Court will not certify any issue for appellate review.

---

[1]        ShisInday was convicted of capital murder and sentenced to death under the name
Danny Dean Thomas. According to his amended petition, "ShozDijiji ShisInday took his name after
his first conviction, after discovering his real birth father was native American. His birth name is
Daniel Dean Derr, although he was later adopted and took the name Daniel Dean Thomas." (Docket
Entry No, 18 at 2 n.3). This Court will refer to the petitioner as ShisInday. Throughout the record,
ShisInday's name is sometimes spelled with a capital "I" and other times not. For consistency's
sake, this Court will use his chosen spelling and silently alter any different rendering of his name.

## FACTUAL AND PROCEDURAL BACKGROUND

A jury first convicted ShisInday of capital murder on March 17, 1982.  The Court of

Criminal Appeals has provided a detailed description of the murder largely taken from

ShisInday's confession:

> The evidence at the guilt/innocence phase of trial revealed that in July of 1981, ShisInday and his girlfriend, Phoebe, were staying at the home of James Peels, his two sons, fifteen-year old Doyle Peels and seventeen-year-old Zendal Peels, and Martha Ann Tarver.  On July 17, ShisInday gave Doyle a ride in his 1969 black-and-white Cadillac to pick up Doyle's work schedule at K-Mart. ShisInday entered the store with Doyle and purchased some ammunition in the sporting goods department.  Later that evening, ShisInday, accompanied by Zendal, drove Doyle and Ronald McHenry to the skating rink.
>
> . . .
>
> According to ShisInday's July 9th transcribed statement and testimony from other witnesses, ShisInday and Zendal went shopping at a Safeway store after dropping the boys off at the rink.  As they were leaving the store, they spotted nineteen-year-old Sylvia Harrison who was having car trouble.  They stopped to help her, and ShisInday determined that she needed a new fan belt.  They drove her across the street to an auto parts store, purchased the belt, and put it on her car.  Harrison asked ShisInday and Zendal to follow her down the street to her house to make sure her car did not overheat again.  Once they arrived, ShisInday fixed a leak in her car's "heater hose."  She offered them a beer and invited them into the house.  They sat in her living room, drank beer, and smoked some marijuana.
>
> According to ShisInday's statement to the police, Zendal unexpectedly hit Harrison in the side of the head with ShisInday's gun, which Zendal had concealed in a paper bag.  They carried Harrison, unconscious, out to the car and shoved her down on the passenger-side floorboard.  They also took several items from her house including her telephone and eye glasses.  ShisInday drove away with Zendal sitting in the passenger seat.  Harrison regained consciousness, kicked the steering wheel, and bit ShisInday's hand. ShisInday told Zendal to grab her, and Zendal hit her in the head again with the gun, knocking her out.  She regained consciousness again, and Zendal repeatedly

2

hit her in the head with his knife until she passed out.  She came to once more
and began repeating, "God help me."  ShisInday got his gun, put it to the side
of her head, and shot her one time.  They drove her to a bridge near the river
and picked up some cinder blocks.  They then drove to a more secluded bridge
and parked under one of the support pillars.  ShisInday looked around to see
if anyone was nearby.  Zendal removed Harrison's clothes and cut off her bra.
After tying cinder blocks to Harrison's feet and neck with a rope, they dumped
her in the San Jacinto River.  ShisInday broke off a willow branch and brushed
away their footprints as they returned to the car.  They drove to a grocery store
parking lot where they threw Harrison's clothes and other personal items in a
dumpster.  Then they went to a car wash and washed the outside and inside of
the car, particularly the floorboard, which was covered in blood.

Opinion on Direct Appeal, at 2-4.[2]

After disposing of Ms. Harrison's body, Zendal and ShisInday returned to the Peels'

home between four and five a.m.  Zendal Peels' father accused ShisInday and Zendal of

being late because they were smoking pot.  ShisInday explained that they had car trouble.

ShisInday then went to sleep in a back bedroom with his girlfriend.

The Peels family soon discovered blood on the outside and inside of ShisInday's

vehicle.  ShisInday's girlfriend woke him up in the morning and confronted him about the

blood.  ShisInday claimed that he ran over a dog, put it in his car, and mercifully killed the

dog to end its suffering.  ShisInday told the same story to the Peels family.  When the Peels

and ShisInday's girlfriend did not believe his story, ShisInday decided to leave.  Before

---

[2]     The state court records consist of a transcript that contains pretrial motions, trial court
orders, jury instructions, and other pleadings, cited as "Trans. at __"; a 37-volume Statement of
Facts, including hearings on pretrial motions, jury voir dire, the guilt/innocence phase, and the
penalty phase, cited as "Tr. Vol. __ at __"; and a transcript of the state habeas proceedings, cited as
"State Habeas Record at __."  The Court will cite to the Court of Criminal Appeals' judgment on
direct appeal as "Opinion on Direct Appeal, at ___."

going, ShisInday threatened Zendal "[i]f I go down, you are going down with me because you are in this with me."  Tr. Vol. 15 at 44.

ShisInday, who had a long history of mental problems, soon sought treatment at a psychiatric hospital claiming that others accused him of killing a person when he actually killed a dog.  After talking to Zendal Peels, and going to Ms. Harrison's residence and finding that there had been a fire, the police arrested ShisInday at around 1:00 a.m. at the hospital.  ShisInday initially repeated his dog story to the police, but he later confessed to killing Ms. Harrison.  In 1982, a jury convicted ShisInday of capital murder and he received a death sentence.  The state courts affirmed his conviction and sentence on state appellate and habeas review.

ShisInday sought federal habeas relief.  On July 2, 1997, United States District Judge Norman Black issued a habeas writ because Texas involuntarily medicated ShisInday with antipsychotic drugs during trial without making a proper inquiry into his mental state.  Texas filed a late notice of appeal.  ShisInday filed a cross-appeal and moved to dismiss the State's untimely appeal.  On October 16, 1997, the Fifth Circuit dismissed the appeal when Texas conceded that the notice of appeal was not timely and that the circuit court lacked jurisdiction.  On October 24, 1997, an assistant attorney general and ShisInday entered into a "stipulation of dismissal" agreeing that: (1) ShisInday would be released immediately; (2) Texas would not seek further review of the final judgment; and (3) ShisInday would not prosecute his cross appeal.  The Fifth Circuit dismissed the cross appeal on November 4,

1997.

On November 5, 1997, the 180th Judicial District Court of Harris County issued a bench warrant for ShisInday's arrest. The bench warrant indicated that ShisInday's case was set for a December 8, 1997, docket call. On December 5, 1997, TDCJ transferred ShisInday to Harris County's custody.

The guilt/innocence phase of ShisInday's second trial began on November 9, 1998. Unlike in his first trial, the jury charge allowed for ShisInday's conviction either as a party or as the principal actor in Ms. Harrison's murder. A jury again found ShisInday guilty of capital murder. After a separate punishment phase, the jury retired to consider Texas' special issue questions.[3] After sending out four notes suggesting that they were experiencing

---

[3]      The special issues submitted pursuant to article 37.071 of the Texas Code of Criminal Procedure provided as follows:

Special Issue No. 1

Was the conduct of the defendant, Shozdijiji ShisInday also known as Danny Dean Thomas, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

Special Issue No. 2

Is there a probability that the defendant, Shozdijiji ShisInday also known as Danny Dean Thomas, would commit criminal acts of violence that would constitute a continuing threat to society?

Special Issue No. 3

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

You are instructed that in answering this "Special Issue" that you shall answer the Issue "Yes" or "No."

(continued...)

5

problems in reaching a verdict, the jury finally answered Texas' special issue questions in a manner requiring the imposition of a death sentence. ShisInday unsuccessfully sought state appellate and habeas relief from his conviction and sentence.

This Court appointed counsel to represent ShisInday throughout federal habeas review. ShisInday filed a lengthy petition raising the following grounds for relief:

1.     The trial court's response to notes indicating that the jury could not reach a decision violated the due process clause.

2.     The jurors impermissibly discussed ShisInday's potential parole eligibility during the punishment deliberations.

3.     Due process requires consideration of affidavits from jurors describing their deliberations.

4.     The trial court violated the Confrontation Clause by allowing testimony from ShisInday's first trial to come before his second jury.

5.     Recent Supreme Court precedent would not allow the presentation of testimony from ShisInday's first trial to be used in his second one.

6.     The State of Texas violated the double jeopardy clause by maintaining custody of and retrying ShisInday.

7.     The State of Texas' reliance on a prosecutorial theory that it had abandoned in the first trial unconstitutionally put ShisInday in jeopardy twice.

---

[3]      (...continued)
You may not answer this Issue "No" unless you agree unanimously, and you may not answer this Issue "Yes" unless ten (10) or more of you agree to do so.
You shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

Trans. at 441-42.

8.      The doctrine of collateral estoppel should have prevented the State of Texas from prosecuting ShisInday as a party to the offense.

9.      The State of Texas unconstitutionally arrested ShisInday without a warrant.

10.      The trial court should have suppressed evidence recovered from ShisInday's vehicle.

11.      The police used coercive tactics to secure ShisInday's confession.

12.      ShisInday's jury should have decided whether probable cause supported his arrest.

13.      The prosecution violated the Constitution by presenting evidence of an extraneous offense committed by ShisInday.

14.      Trial counsel provided ineffective assistance by not requesting an instruction allowing the jury to find that drug use made ShisInday temporarily insane at the time of the offense.

15.      The prosecution unconstitutionally threatened Zendal Peels with prosecution if he testified at ShisInday's second trial.

16.      The prosecution engaged in misconduct by suggesting to the jury that ShisInday raped the victim.

17.      Trial counsel provided ineffective assistance by failing to rebut the prosecution's allegations of rape.

18.      The prosecution improperly questioned a witness about ShisInday's exercise of his right not to testify.

19.      The trial court failed to grant a mistrial when a witness mentioned the exercise of ShisInday's constitutional rights.

20.      The trial violated ShisInday's constitutional rights by allowing the admission of evidence of prior convictions.

21.      The state court unconstitutionally prevented ShisInday from

representing himself on state habeas review.

22.     The cumulative effect of the errors in this case requires habeas relief.

23.     Appellate counsel violated ShisInday's rights by not advancing certain claims.

24.     ShisInday's mental illness precludes his execution.

25.     ShisInday's prolonged stay on death row constitutes cruel and unusual punishment.[4]

Respondent filed an answer to the habeas petition.  (Docket Entry No. 21).  ShisInday filed a reply, both through counsel and in a *pro se* pleading.  (Docket Entry Nos. 27 and 31).  ShisInday's petition is ripe for adjudication.

## LEGAL STANDARDS

"The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials."  *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *see also Moore v. Dempsey*, 261 U.S. 86, 87-88 (1923) ("[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved.").  "Even less is federal habeas a means by which a defendant is entitled to delay an execution indefinitely."  *Barefoot*,  463 U.S. at 887.  Accordingly, federal habeas proceedings honor the "presumption of finality and legality [that] attaches to [a petitioner's] conviction and sentence."  *Id.* at 887.  Statutory and judicial

---

[4]     ShisInday's petition does not number his claims.  This Court has divided his claims in a manner most conducive to orderly adjudication.

policies , including the AEDPA, safeguard traditional limits on habeas review.

*The AEDPA*

The AEDPA provides for a deferential review of state court judgments.  "Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases and to further the principles of comity, finality, and federalism[.]" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quotation and citation omitted).  The AEDPA forbids habeas relief on issues adjudicated on the merits in state court unless the state decision "was contrary to, or an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The Supreme Court has held that a state court decision is "contrary to" federal precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) "the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413 (2000); s*ee also Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  A state court may unreasonably apply federal law if it "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the particular facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S.

at 407.[5]

The AEDPA also affords significant deference to a state court's resolution of factual issues.  Under 28 U.S.C. § 2254(d)(2) "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341.

Nevertheless, a petitioner's compliance with 28 U.S.C. § 2254(d) does not entitle him to habeas relief.  No Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]"  *Horn v. Banks*, 536 U.S. 266, 272 (2002); *see also Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively").  Other judicial doctrines, such as the harmless-error doctrine and the non-retroactivity

---

[5]       A federal habeas court's review under 28 U.S.C. § 2254(d) "should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence."  *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).  In reviewing the state court's substantive decision under the AEDPA, this Court focuses on "'determining the reasonableness of the state court's 'decision,' . . . not grading their papers.'" *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001)); *cf. Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986) (observing that "federal courts do not sit as courts of appeal and error for state court convictions").  Accordingly, this Court bases its AEDPA examination on "the state court's ultimate conclusion, not on its reasoning." *DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002).

10

principle, bridle federal habeas relief.  *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir.

2005).   Any trial error cannot require habeas relief unless it "ha[d] a 'substantial and

injurious effect or influence in determining the jury's verdict.'"  *Robertson*, 324 F.3d at 304

(quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)); *see also Aleman v. Sternes*, 320

F.3d 687, 690-91 (7th Cir. 2003) ("Nothing in the AEDPA suggests that it is appropriate to

issue writs of habeas corpus even though any error of federal law that may have occurred did

not affect the outcome.").   A habeas court likewise cannot grant relief if it would require the

creation of new constitutional law.  *See Horn*, 536 U.S. at 272 (relying on *Teague v. Lane*,

489 U.S. 288 (1989)).[6]

### *The Exhaustion and Procedural Bar Doctrines*

Federal law erects procedural hurdles to habeas review, including the exhaustion and

procedural bar doctrines.  Section 2254 provides that habeas relief shall not be granted if the

---

[6]        Federal habeas relief generally may not be premised on "a new rule" of law if the
Supreme Court announced that rule after the petitioner's conviction became final, if the petitioner
wishes to establish a wholly new rule, or if the petitioner seeks to apply a settled precedent in a novel
way that would result in the creation of a new rule.  *See Teague*, 489 U.S. at 310; *Penry v. Lynaugh*,
492 U.S. 302, 313 (1989) (finding *Teague* applicable in the capital context).   "[A] case announces
a new rule when it breaks new ground or imposes a new obligation on the States or the Federal
government. . . . To put it differently, a case announces a new rule if the result was not *dictated* by
precedent existing at the time the defendant's conviction became final."  *Teague*, 489 U.S. at 301;
*see also Graham v. Collins*, 506 U.S. 461, 467 (1993). As a general rule, "if the State . . . argue[s]
that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply *Teague*
before considering the merits of the claim . . . ."  *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994); *see
also Horn*, 536 U.S. at 272 ("[A] federal court considering a habeas petition must conduct a
threshold *Teague* analysis when the issue is properly raised by the state.").

petitioner has failed to exhaust available state remedies.  *See* 28 U.S.C. § 2254(b)(1).[7]

Exhaustion requires that a petitioner fairly present his claims to the state courts before federal

review becomes available.  A petitioner satisfies the exhaustion requirement when he raises

the substance of his federal habeas claim in the highest state court. "A federal court claim

must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the

'fairly presented' requirement."  *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998)

(quoting *Picard v. Connor*, 404 U.S. 270, 278 (1971)).  While "[t]he habeas applicant need

not spell out each syllable of the claim before the state court to satisfy the exhaustion

requirement," *Whitehead*, 157 F.3d at 387, the exhaustion requirement "is not satisfied if a

petitioner presents new legal theories or entirely new factual claims in his petition to the

federal court." *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983) (footnote omitted); *see also*

*Nobles*, 127 F.3d at 420; *Anderson v. Harless*, 459 U.S. 4, 6-7 (1982).  Simply, the substance

of the federal claim must be the same as the one presented in state court.  *See Fisher v. Texas*,

169 F.3d 295, 302 (5th Cir. 1999); *Whitehead*, 157 F.3d at 387; *Burns v. Estelle*, 695 F.2d

847, 849 (5th Cir. 1983).

The procedural bar doctrine may also impede federal review of a petitioner's claims.

"When a state court declines to hear a prisoner's federal claims because the prisoner failed

to fulfill a state procedural requirement, federal habeas is generally barred if the state

---

[7]     "An application for a writ of habeas corpus may be denied on the merits,
notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the
State." 28 U.S.C. § 2254(b)(2).  This Court, however, cannot grant relief under the AEDPA if a
petitioner has failed to exhaust the available state court remedies.  *See* 28 U.S.C. § 2254(b)(1)(A).

procedural rule is independent and adequate to support the judgment." *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001).   A state procedural default, however, is not an insurmountable barrier to federal review.  The Supreme Court has noted that

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  "This doctrine ensures that federal courts give proper respect to state procedural rules."  *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (finding the cause and prejudice standard to be "grounded in concerns of comity and federalism").

A petitioner's failure to exhaust his claims may also result in a federal procedural bar. *See Horsely v. Johnson*, 197 F.3d 134, 137 (5th Cir. 1999).  "A procedural default . . . occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'"  *Nobles*, 127 F.3d at 420 (quoting *Coleman*, 501 U.S. at 734 n.1).   An inmate who files a petition containing unexhausted claims usually cannot return to state court because Texas' abuse-of-the-writ doctrine (codified at TEX. CODE CRIM. PRO. art. 11.071 § 5) generally prohibits the filing of successive state habeas applications.  The Fifth Circuit has held that article 11.071 is an adequate state procedural bar, finding that Texas courts strictly and regularly enforce its

13

standards.  *See Barrientes v. Johnson*, 221 F.3d 741, 759 (5th Cir. 2000); *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998).  A petitioner may also overcome the procedural bar resulting from Texas' limitation on successive habeas applications by making a sufficient showing of cause and prejudice.  *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Jones v. Johnson*, 171 F.3d 270, 277 (5th Cir. 1999).

### *Summary Judgment*

Respondent has moved for summary judgment.  Summary judgment is proper where the record shows "no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56.  "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  In ordinary civil cases, a district court considering a motion for summary judgment must construe disputed facts in a light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").

However, a court must view a summary judgment motion through "the prism of the substantive evidentiary burden."  *Id.* at 254.  Congress, through the AEDPA, has constricted both the nature and availability of habeas review.  This Court, therefore, applies general summary judgment standards only insofar as they do not conflict with the language and intent of the AEDPA or other habeas law.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002)

("[Rule 56] applies only to the extent that it does not conflict with the habeas rules."),
*overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); Rule 11 of the
RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS ("The
Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any
statutory provisions or these rules, may be applied to a proceeding under these rules.").
Where the state courts have already resolved a prisoner's factual allegations by express or
implicit findings, and the prisoner fails to prove by clear and convincing evidence that 28
U.S.C. § 2254(e)(1)'s presumption of correctness should not apply, construing facts in his
favor is inappropriate and unauthorized.

ShisInday presented many of his claims in state court. The state courts issued detailed
findings of fact and explicit conclusions of law with respect to each exhausted claim.
Accordingly, the AEDPA guides this Court's summary judgment review. Where facts have
been determined by the Texas state courts, this Court is bound unless ShisInday sufficiently
refutes those findings.

## ANALYSIS OF SHISINDAY'S CLAIMS

### I.    Improprieties in Jury Deliberation (claims 1-3).

ShisInday raises three claims involving what he considers improprieties that
influenced the jury's deliberations. ShisInday alleges that the trial court coerced the jury into
returning death-eligible answers to the special issues by not declaring a mistrial when the jury
sent out notes that expressed discouragement in, or an inability to continue, the deliberative

process (claim one). ShisInday also argues that, ignoring the trial court's explicit instructions, the jurors speculated on the parole eligibility accompanying a life sentence in Texas (claim two). Finally, ShisInday faults the state habeas court for applying the Texas Rules of Evidence to bar consideration of affidavits ShisInday submitted to support his first two claims (claim three). The Court finds that ShisInday has not shown entitlement to habeas relief on these claims.

A.     The Admissibility of Affidavits from Jurors (claim three)

Resolution of ShisInday's third claim – that the due process clause requires consideration of affidavits by jurors describing their deliberations – influences the viability of his first and second claims. On state habeas review, ShisInday supported his claims of impropriety in jury deliberation with affidavits from jurors who served at his trial. The substance of the affidavits discussed the impact that the trial court's instructions had on the sequestered jurors and also revealed that they discussed the parole implications of giving ShisInday a life sentence. The state court refused to consider the substance of the affidavits. Relying on TEX. R. EVID. 606(b),[8] the state habeas court found that the affidavits "constitute

---

[8]     TEX. R. EVID. 606(b) provides as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly

(continued...)

impermissible jury testimony relating to the validity of the verdict or attempting to impeach the verdict and do not qualify as permissible testimony concerning outside influences that affected the jury's decision or concerning a claim of juror disqualification." State Habeas Record at 2144, ¶163. The state court also found that TEX. R. EVID. 606(b) did not deprive litigants of any right under the United States or Texas Constitution. State Habeas Record at 2145, ¶167-68. ShisInday now contends that the state court's reliance on Rule 606(b) to bar consideration of the affidavits violates the federal due process clause. ShisInday also asks this Court to consider the substance of the affidavits in resolving his federal claims.

As an initial matter, ShisInday's claim involving the content of the jurors' affidavits does not raise an actionable ground for habeas relief. ShisInday's briefing on this issue does not challenge the integrity of his conviction or sentence. Nor does this claim show that ShisInday is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). ShisInday's challenge to the state habeas court's refusal to consider the challenged affidavits in adjudicating his habeas claims is collateral to his custody. "[A]lleged infirmities in state habeas proceedings are not grounds for federal habeas relief." *Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005), *cert. denied*, ___ U.S. ___, 126 S. Ct. 1434 (2006); *see also Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001); *Trevino v. Johnson*, 168 F.3d 173,

---

[8]       (...continued)
brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

17

180 (5th Cir. 1999); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992).

The Court cannot order ShisInday's release from custody because the state habeas court did not consider certain evidence. Nevertheless, this claim seems to be a vehicle to breathe life into his otherwise-unsupported claims of improper jury deliberations. While the Court will consider his arguments in that context, the Court denies his third claim insofar as he intends it to be a separate constitutional issue.

On federal review, ShisInday relies on the affidavits already in the record. He also presents for the first time three new affidavits from jurors.[9] ShisInday argues that, the state court's holding notwithstanding, this Court should evaluate the statements the jurors made about their deliberations. FED. R. EVID. 606(b), which is similar but not identical to the analogous Texas provision, restricts inquiry into a jury's deliberations.[10] Specifically, the

---

[9]     For the first time on federal review, ShisInday provides affidavits from three jurors which replicate the allegations that he made in state court. Jurors Keith Barker, Berry Spencer, and Henry Joe Hopkins each submitted new affidavits on federal habeas review. (Docket Entry No. 1, Exhibit 4). Each of these affidavits attests that jurors discussed the issue of parole during deliberations. Respondent contends that the submission of these affidavits for the first time on federal review renders them unexhausted, and thus procedurally barred. While the Fifth Circuit has traditionally disfavored the expansion of the factual record beyond that presented to the state courts, *see Joyner v. King*, 786 F.2d 1317, 1320 (5th Cir. 1986); *Brown v. Estelle*, 701 F.2d 494, 495-96 (5th Cir. 1983), recent cases have shown a greater willingness to consider new evidence so long as it "merely supplement[s] the petitioner's claims." *Morris v. Dretke*, 413 F.3d 484, 495 (5th Cir. 2005); *see also Conner v. Quarterman*, ___ F.3d ___, 2006 WL 210342, at *4-5 (5th Cir. Jan. 29, 2007). This Court, however, does not need to explore the nuances of the exhaustion doctrine with respect to this issue because FED. R. EVID. 606(b) prevents consideration of the affidavits.

[10]     FED. R. EVID. 606(b) states:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations

(continued...)

federal rule states that "[a] juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying." FED. R. EVID. 606(b). The Fifth Circuit has found that "both FED. R. EVID. 606(b) and TEX. R. EVID. 606(b) bar all juror testimony concerning the jurors' subjective thought processes." *Salazar v. Dretke*, 419 F.3d 384, 402-03 (5th Cir. 2005), *cert. denied*, ___ U.S. ___, 126 S. Ct. 1467 (2006). The Fifth Circuit holds that no "Supreme Court precedent obligate[s] a state court to admit testimony from jurors concerning their internal discussions about parole law during deliberations." *Id.* at 399-400; *see also Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006). ShisInday does not show that his evidentiary material falls within any established exception to the federal rules. The state courts properly refused to consider the challenged affidavits; federal procedure likewise prevents reliance on those affidavits. This Court cannot consider the affidavits from former jurors about their deliberations in adjudicating ShisInday's habeas claims.

B.    The Trial Court's Responses to Jury Notes (claim one)

ShisInday complains that the trial court coerced or improperly influenced the jury into

---

[10]    (...continued)
or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

answering the special issues in a manner resulting in a death sentence.  The punishment phase of ShisInday's trial lasted from November 17 to November 19, 1998.  The parties adduced testimony from 18 witnesses and introduced into evidence approximately 120 exhibits.  The jury also had to reconsider significant testimony and evidence from the guilt/innocence phase in answering the special issue questions.  The trial court's instructions informed the jury that, pursuant to Texas' "12-10" rule, they must either answer the special issues in the affirmative unanimously or in the negative with ten votes.  Trans. at 421.  Texas law did not allow the instructions to divulge that a hung jury would result in the imposition of a life sentence.

The jury deliberated ShisInday's punishment from November 19 to November 22. Throughout that period, the jury sent out notes that shed some light on the status of their deliberations.  The jury retired to deliberate at 12:30 p.m. on November 19.  At 1:43 p.m., the jury sent out a note requesting evidentiary material, including ShisInday's prison records, and additional legal pads.  Trans. at 415.  At around 5:45 p.m., the jury sent out a note stating:"[w]e have not reached a conclusion.  We believe it will be some time before we work this out – which we believe we will."  Trans. at 416.  The trial court sequestered the jury.

Jury deliberations began again on November 20 at around 8:30 a.m.  At 10:06 a.m., the jury sent out a note requesting a list of all the evidence, as well as copies of ShisInday's psychiatric and school records.  Trans. at 430.  The jury note specified that the jurors wanted an exhibit list "to better define [their] requests."  Trans. at 430.  After around nine total hours

20

of deliberations, the jury sent out a note at 11:45 a.m. indicating that it was unable to agree on Special Issue Number Three and "there seems little hope of any movement on individual juror's positions."  Trans. at 431.  The trial court did not immediately answer that note.

Later that afternoon, the trial court discussed the 11:45 a.m. note on the record:

| | |
|---|---|
| The Court: | I have received a note stamped 11:56 a.m., this morning indicating that the jury is unable to agree on Special Issue No. 3.  It is now 2:56 according to my watch.  The jury has been, since the note was sent out, been to lunch and been on at least one break. |
| Trial Counsel: | And you are proposing to do what? |
| The Court: | I was going to send them a note, "Please continue your deliberations." |
| Trial Counsel: | For the record, we object to that and move for a mistrial.  I think that any further deliberations will be unconscionable since the jury sent out a note saying after conscientious deliberation they can't resolve Issue No. 3.  So, we move for a mistrial. |
| The Court. | That is denied. |

Tr. Vol. 26 at 3.  The trial court wrote its response – "please continue your deliberations" – and returned the note to the jury.  The record does not indicate at what time the trial court delivered that response, but it presumably occurred between the 2:56 p.m. hearing and the next jury note.  At 3:45 p.m., the jury, apparently using a copy of the exhibit list, requested "State's Exhibits 102, 103, 105, 106" which chronicled ShisInday's prior convictions.  Trans. at 432.

At 4:20 p.m. the jury issued another note:

21

> [w]e the jury remain at the same 9-3 vote.  The 3 haven't changed since
> yesterday, and they insist they will not change. The 9 haven't changed, and
> they insist they will not change.  Continued deliberations are futile.

Trans. at 433.  Ten minutes later, trial counsel moved again for a mistrial.  Tr. Vol. 26 at 4.

The trial court denied the mistrial motion and stated "For the record I will note that the jury

sent out a note yesterday at the end of the day 5:45 and said they could resolve.  We believe

it will be some time before we work this out which we believe we will, which was the note

yesterday afternoon.  So I will deny your motion at this point."  Tr. Vol. 26 at 4-5.  Trial

counsel objected to the trial court's repeated instruction to "please continue your

deliberations."  Tr. Vol. 26 at 5; Trans. at 433.

Half an hour later, the defense came back on the record with a new motion for a

mistrial because of jury deadlock.  Tr. Vol. 26 at 5-6.  Trial counsel also requested an

instruction that "if they can't arrive at a unanimous verdict on the special issues concerning

favoring death or a 10-person agreement on special issues favoring life that a mistrial must

be declared and that the defendant would not be discharged, that the defendant would receive

an automatic life sentence."  Tr. Vol. 26 at 6.  The trial court denied the mistrial and the

requested instruction.  Tr. Vol. 26 at 6-7.

At 5:30 p.m., the jury requested a magic marker.  Trans. at 435.  Twenty minutes later

they sent out a note stating: "We have 9 votes 'no' and 3 votes 'yes.'  Of the 3 votes, 1 has

repeated that he will not consider any change 'for all of eternity.'  The other 2 are holding

firm.  Of the 9 'no' votes, all are firm."  Trans. at 436.[11]  Trial counsel again moved for a

mistrial which the trial court again denied.  The jury retired for the evening without receiving

any response to their note.

Jury deliberations began again on Saturday, November 21 at 8:15 a.m.  At 10:04 a.m.,

the jury issued the following note: "Our vote is 10 'no' and 2 'yes.'  Of the 'yes' votes, one

continues to insist that no argument or discussion will change his position.  The 10 'no' votes

are firm."  Trans. at 437.  The defense moved for a mistrial which the trial court denied.  Tr.

Vol. 27 at 3-4.  The record contains no response to that jury note.  At 5:55 p.m., the defense

again moved for a mistrial.  In denying the motion, the trial judge commented "the record

should reflect that the last note I received from the jury was this morning at 10:00 o'clock

and indicated that there had been some change since yesterday evening with respect to the

vote in the jury room.  Deny your motion."  Tr. Vol. 27 at 5.  The defense also unsuccessfully

requested that the trial court deliver a supplemental instruction concerning the effect of jury

deadlock.  Tr. Vol. 27 at 5.

On Sunday, November 22, the jury began deliberating at 8:40 a.m.  At 9:11 a.m., the

jury sent out a note requesting State's exhibits and also asking which of ShisInday's hands

the victim bit.  Trans. at 439.  The defense filed a written motion for mistrial at 9:25 a.m.:

"Further deliberations would be coercive and there appears to be an acrimonious tone

developing to the deliberations due to raised voices on at least one juror's part."  Trans. at

---

[11]     Here, the jury refers to their votes on the third, "mitigation" special issue.  A "no"
answer to the special issue authorizes the imposition of a death sentence.

440.  At 9:45 a.m., the jury indicated that it had reached a unanimous verdict.  Before the trial court read the jury's answers to the special issues, trial counsel orally renewed the motion for a mistrial because

> the jury deliberations that have caused this verdict to come in have been lengthy and coercive upon the individual members of the jury.  Jury members were told that they would not have to work on weekends or generally were spoken to in that proposition during voir dire and during their individual voir dire.
>
> We are now at least halfway through a weekend and we would move that any verdict reached at this point would be coercive and contrary to the general instruction that may have been given the jurors during their voir dire and would lead them to feel more compelled to render a verdict at this time than any other time.

Tr. Vol. 28 at 3-4.  The trial court denied the motion.  The trial court read the verdict and individually polled the jurors.  The trial court then sentenced ShisInday to death.

On direct appeal, ShisInday claimed that the trial court erred in failing to grant the defense's eight motions for a mistrial.  ShisInday argued that the trial court's initial response to jury notes, and then subsequent silence, coerced the jury into returning a verdict. ShisInday specifically relied on *Jenkins v. United States*, 380 U.S. 445 (1965), a case where the Supreme Court reversed a criminal conviction when the trial court instructed a deadlocked jury "You have got to reach a decision in this case."  *Id.* at 446.  ShisInday argued that, like in *Jenkins*, the trial court's instruction improperly told the jury that they had to reach a verdict.

The Court of Criminal Appeals reviewed the record of jury notes and trial court

24

responses and found that the trial court did not err in denying the mistrial motions.  The Court

of Criminal Appeals found that the initial jury note

> did not indicate that it was at an impasse but only that there was 'little hope.'
> The night before the jury had indicated that it believed that it could work it out,
> and that it had just requested more information before sending the note.  So,
> there were significant indications that the jury was still deliberating.

With regard to the second note, the Court of Criminal Appeals found that

> The trial court is not constrained to enter a life sentence after the first sign of
> juror impasse, but may do so if in its discretion it determines that the jury has
> been together for such a time as to render improbable that they can agree.  The
> jury had only been deliberating for a little more than a day, evaluating the
> testimony of over 35 witnesses and more than 120 exhibits.  The trial court did
> not abuse its discretion in overruling the motion for mistrial.

The Court of Criminal Appeals also found that the jury continued to "show[] that it was

making progress" the next day because "[i]n gaining one more 'no' vote, the jury did appear

to be making deliberative progress."  Finally, "[c]onsidering the length of the trial, number

of exhibits, and notes from the jury indicating that they were continuing to deliberate, we

hold that the trial court did not abuse its discretion in overruling ShisInday's motions for a

mistrial."  Opinion on Direct Appeal, at 60-62.

Again relying on the *Jenkins* case, ShisInday renewed his claim on state habeas

review, this time focusing more on the propriety of the trial court's responses and using jury

affidavits to show the pressure jurors felt.  The state habeas court found that, since he had

already raised the issue on direct appeal, the court could not consider ShisInday's expanded

claim on habeas review.  State Habeas Record at 2179, ¶104.  In the alternative, the state

habeas court concluded that "the trial court did not abuse its discretion and properly denied [ShisInday's] motions for mistrial, based on the length of trial, the amount of testimony, the number of exhibits, and the jury's notes indicating that the jury was continuing to deliberate." State Habeas Record at 2179, ¶105.

ShisInday again challenges the trial court's urging the jury to continue deliberations.[12] ShisInday argues that the trial court's response to the jury notes "transformed [the jury room] into a pressure cooker" and coerced deliberations to the point that he "received death from the judge, not the jury." (Docket Entry No. 18 at 20, 24). ShisInday points to several factors that infringed on the jury's untrammeled consideration of the evidence. ShisInday complains that the trial court's response to the first two jury notes – "please continue your deliberations" – informed the jury that it must return a verdict, as was found impermissible in the *Jenkins* case. Because the jury told the trial judge the exact number of votes in its notes, ShisInday also argues that the trial court's responses implied that the jury should deliberate until it returned a sentence allowing for his death. ShisInday contends that the trial court compounded the error by repeatedly delivering the same response, but then not answering

---

[12]     ShisInday repeatedly calls the trial court's responses an "*Allen* charge." "The phrase '*Allen* charge' refers to supplemental jury instructions that urge deadlocked juries to forego their differences in order to reach a unanimous verdict. The original *Allen* charge urged the minority of the jury to consider the views of the majority in an effort to determine whether the minority views were reasonable under the circumstances." *Boyd v. Scott*, 45 F.3d 876, 878 (1994) (citing *Allen v. United States*, 164 U.S. 492, 501 (1896)). The state habeas court correctly found that, since the trial court's responses omitted the harsher instructions contained in true dynamite charges, "the trial court did not give a supplemental *Allen* charge in [ShisInday's] case; instead, the trial court instructed the jury to continue deliberating." State Habeas Record at 2144, ¶159.

the jury's last pleas.

To succeed on habeas review, ShisInday must show by clearly established Supreme Court precedent that the state courts improperly interpreted or applied federal law. ShisInday basis his claim on *Jenkins v. United States*, 380 U.S. 445 (1965). ShisInday argues that the similarity between the instruction given in *Jenkins* ("You have got to reach a decision in this case") and that given in his case requires this Court to set aside his punishment. ShisInday argues that, like in *Jenkins*, the trial court's instructions informed the jury that "a mistrial was not acceptable, only a verdict was." (Docket Entry No. 18 at 22).

The Supreme Court has distinguished the application of *Jenkins* in habeas cases. The Supreme Court has noted that *Jenkins* is not relevant "to the § 2254(d)(1) determination, since [it does not] set forth a rule applicable to state-court proceedings. *Jenkins* . . . reversed [a] conviction[] based on jury instructions given in [a] federal prosecution[], and [did not] purport[] to interpret any provision of the Constitution." *Early*, 537 U.S. at 10. Since *Jenkins* involved the Supreme Court's supervisory power over federal criminal trials, *see Lowenfield v. Phelps*, 484 U.S. 231, 239 n.2 (1988), ShisInday's reliance on that case cannot command federal habeas relief.

The Supreme Court has elsewhere held that a court must look beyond the mere similarity between the instruction given by a trial court and that rejected in *Jenkins*, and instead "consider the supplemental charge given by the trial court 'in its context and under all the circumstances.'" *Lowenfield*, 484 U.S. at 237 (quoting *Jenkins*, 380 U.S. at 446). The

state courts extensively reviewed the timing, content, and message of each jury note.  In light of the circumstances surrounding the jury deliberations, the state courts reasonably found that the trial court did not err in its instructions or in denying the mistrial motions.

"A judge may encourage jurors who are having difficulty reaching a verdict to deliberate longer, and to give due consideration and respect to the views of their peers." *United States v. Straach*, 987 F.2d 232, 242 (5th Cir. 1993) (citing *Allen v. United States*, 164 U.S. 492 (1896)).  "It is not only permissible but proper for a trial judge to ask a jury to continue deliberating if it appears that further deliberation might be fruitful in helping the jury reach a unanimous verdict."  *Coleman v. Quarterman*, 456 F.3d 537, 548 (5th Cir. 2006).  The Court of Criminal Appeals found that the jury notes did not indicate a complete breakdown in deliberations and that, in fact, the jury was making progress.  Even though the trial court did not respond to all the jury notes, the jury's repeated requests signaled that productive deliberations continued.[13]

---

[13]     ShisInday argues that the trial court's knowledge of the exact numerical division of jurors, in conjunction with the repeated insistence to keep deliberating, coerced the jury toward death.  "The potential for coercion exists when a trial judge inquires as to the 'nature or extent of [the jury's] division' and then instructs the jury to continue deliberating."  *Coleman*, 456 F.3d at 548 (quoting *Lowenfield*, 484 U.S. at 239-40).  While in *Brasfield v. United States*, 272 U.S. 448 (1926), "the Supreme Court held that such an inquiry was *per se* reversible error on direct review of a federal criminal conviction, every court of appeals that has addressed the issue has held that *Brasfield*'s *per se* rule does not apply in the habeas context."  *Montoya v. Scott*, 65 F.3d 405, 412 (5th Cir. 1995); *see also Thompson v. Cain*, 161 F.3d 802, 810 (5th Cir.1998) (denying habeas relief when "[t]he judge inquired [into the numerical division of jurors] simply to assess the progress of the jury" and no improper pressure was put on the jury).  Here, the trial judge did not ask about the numerical division of jurors nor comment on it in the responses.  Even in the federal court's supervisory role over federal criminal convictions, the Fifth Circuit has "held that 'the unsolicited disclosure of the jury division by the foreman is not by itself a ground for a mistrial.'"  *Coleman*, 456 F.3d at 548

(continued...)

ShisInday's jury faced a difficult task.  The jury had to consider their answers to the special issues in the context of numerous exhibits and significant witness testimony.  After the jurors' initial disclosure that they would need more time but could still reach a decision, the trial court was not unreasonable in expecting deliberations to continue through November 20 despite the jury's opinion that continued discussion would be futile.  Rather than being a coercive intrusion into the independence of the jury's deliberations, the trial court's responses served as permissible words of encouragement.  All the evidence on November 21 suggested movement in the jury's position and that productive consideration continued.  After a little over an hour of deliberation on November 22, the jury returned a verdict.  In the end, the state courts held that "[c]onsidering the length of the trial, number of exhibits, and notes from the jury indicating that they were continuing to deliberate . . . the trial court did not abuse its discretion in overruling ShisInday's motions for a mistrial."  Opinion on Direct Appeal, at 62.  ShisInday has not shown that this decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  The Court denies ShisInday's first ground for relief.

C.      The Jury's Discussion of Parole Eligibility (claim two)

Consistent with then-applicable Texas law, the trial court instructed the jury "not to

---

[13]      (...continued)
(quoting *United States v. Warren*, 594 F.2d 1046, 1049 n. 3 (5th Cir. 1979)).  In this case, the jurors' disclosure of the status of their deliberations demonstrated that the deliberations continued.  The fact that there was subsequent movement in the jurors' deliberations indicated that they had not reached an insurmountable barrier.  The jury instruction did not unduly influence the direction of the jury's deliberations, but merely encouraged the jury to continue.

consider or discuss the possible actions of the Board of Pardons and Paroles or the governor, nor consider how long a defendant would be required to serve a sentence of life imprisonment, nor how the parole laws would be applied to this defendant." Trans. at 423.[14] ShisInday argues that the jury improperly discussed the possibility that he would be paroled if he received a life sentence. ShisInday points to various factors that he speculates that may have exposed the jury to information about his possible parole eligibility: the jurors made unsupervised visits to their homes before being sequestered; a local paper ran a story on the evening the jury was sequestered which mentioned that ShisInday could theoretically be instantly eligible for parole if given a life sentence; and during deliberations one juror, while accompanied by a sheriff's deputy, attended a funeral. The essence of ShisInday's claim, however, is that the jury actually discussed parole eligibility during deliberations.[15]

---

[14]    "Traditionally, in Texas, parole is not a matter for a jury's consideration in a capital murder trial." *See Smith v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995). Texas now allows a capital defendant to request a jury instruction regarding his parole eligibility. *See* TEX. CODE CRIM. PRO. art. 37.071(e)(2)(b) (Vernon 2002).

[15]    On state habeas review, ShisInday supported this claim with an affidavit from Barry Brody Spencer, a juror who served at his trial. Mr. Spencer stated that

> Part of the instructions given to the jury by the Judge included the fact that we could not consider the fact that, if given a life sentence, the defendant could possibly receive parole at some point in time. Some of the jurors totally ignored these instructions and were very adamant that this defendant only receive the death sentence because they did not want him out on parole.

State Habeas Record at 554. ShisInday sought to bolster this account with an affidavit from his investigator, J.O. Yerby. Mr. Yerby's affidavit summarized notes he made from his interview with Henry Joe Hopkins, Jr., another juror who served at trial. According to Mr. Yerby, Mr. Hopkins stated that the judge's instruction not to discuss the parole implications was a "major problem,"

(continued...)

As previously discussed, the state habeas court refused to consider the substance of the affidavits ShisInday submitted to support his claim of improper jury deliberations. Because the omission of that evidence left ShisInday without any support for his claim that the jury discussed parole, the state courts concluded that ShisInday "fails to show jury misconduct." State Habeas Record at 2180, ¶¶ 107-08. The state court's determination that no admissible evidence supported his habeas claim is an adjudication on the merits that requires federal deference under 28 U.S.C. § 2254(d)(1). *See Salazar*, 419 F.3d at 398. Habeas relief only becomes available if that holding was contrary to, or an unreasonable application of, federal law.

ShisInday presents no admissible evidence that the jury actually considered the operation of parole law during its deliberations. The Fifth Circuit has previously considered, and rejected, similar claims of jury misconduct that are based on an inadmissable evidentiary foundation. The Fifth Circuit has found that

> [n]o clearly established Supreme Court authority holds that a defendant is entitled to a new trial when one juror misstates the law of parole to other jurors during deliberations, nor does any Supreme Court precedent obligate a state

---

[15]      (...continued)

particularly because "[s]everal of the female jurors totally ignored the Judge's instructions and would not consider a life sentence because they were afraid that the defendant might get out of prison on parole." State Habeas Record at 557. Mr. Yerby recorded that Mr. Hopkins told him that the heated jury deliberations almost resulted in physical violence. State Habeas Record at 557. Aside from both the federal and state rules limiting consideration of affidavits detailing a jury's deliberative process, Mr. Yerby's affidavit almost entirely consists of hearsay for which ShisInday provides no exception to make its contents admissible. On federal habeas review, ShisInday provides an affidavit from Mr. Hopkins verifying Mr. Yerby's account of the jury deliberations, along with two new juror affidavits attesting that jurors inappropriately discussed parole.

31

court to admit testimony from jurors concerning their internal discussions about parole law during deliberations. In fact, the existing clearly established Supreme Court case law suggests the opposite.

*Salazar*, 419 F.3d at 399-400 (footnote omitted). Specifically, in *Tanner v. United States*, 483 U.S. 107, 120-21 (1987), the Supreme Court upheld limitations on the post-trial exploration of the jury's internal deliberations:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.

While ShisInday's petition alleges that some circumstances surrounding the jury may have made knowledge of his parole-eligibility accessible, he has not shown that the jurors had any contact with an outside influence that encouraged them to speculate on the influence of parole law. Instead, ShisInday's claim and the inadmissible affidavits he offers in support focus on the private, internal deliberations of the jury. The state habeas court properly refused to consider the jury members' affidavits revealing the content of the deliberations.[16]

---

[16]    Even if ShisInday could show that the jury speculated on the operation of parole law, that alone does not necessarily require relief. Under Texas law "not every mention of parole during jury deliberations calls for reversal. Only jury misconduct that deprives the defendant of a fair and impartial trial warrants granting of a new trial." *De La Rosa v. Texas*, 743 F.2d 299, 304 (5th Cir. 1984) (citation omitted); *see also Parr*, 472 F.3d at 258. The brief view that the challenged affidavits give into the jury's deliberations only shows that they discussed parole. It is not clear that the

(continued...)

ShisInday has not shown that the state habeas court otherwise ran afoul of federal law in rejecting his jury misconduct claim.  *See* 28 U.S.C. § 2254(d)(1).  This Court denies ShisInday's parole-discussion claim.

## II.    Presentation of Testimony from ShisInday's First Trial (claims 4 and 5).

ShisInday complains that the prosecution violated his Confrontation Clause rights by reading into the record the testimony of Ernest Gilliam, a witness from his first trial.  Mr. Gilliam died before ShisInday's retrial.[17]  Mr. Gilliam's brief testimony – consisting of four pages of the record – served only to show that Mr. Gilliam sold ShisInday a .25 caliber automatic pistol with which he presumably shot the victim.  Tr. Vol. 18 at 98-101.

At the second trial, the defense objected to the introduction of Mr. Gilliam's testimony because ShisInday's forced medication prevented his active participation in cross-examination at the first trial.  Tr. Vol. 18 at 92-93.[18]  The defense also argued that, had he lived, Mr. Gilliam would have served as a mitigation witness for the defense.  Tr. Vol. 18 at 93.  The trial court allowed the prosecution to offer into evidence the portion of the trial record with Mr. Gilliam's testimony. Tr. Vol. 18 at 97.  The two prosecutors then read Mr. Gilliam's testimony into the record.  Tr. Vol. 18 at 98-101.

---

[16]      (...continued)
affidavits prove that ShisInday received a fundamentally unfair trial.

[17]      On October 5, 1998, the defense stated on the record that Gilliam was dead.  Tr. Vol. 2 at 4.  The prosecution had already informed the defense of his death.  Tr. Vol. 4 at 8.

[18]      At the first trial, defense counsel only asked Mr. Gilliam one question.  In response, Mr. Gilliam testified that the gun had one clip when he sold it to ShisInday.  Tr. Vol. 18 at 101.

ShisInday argued on direct appeal that his forced medication at the first trial prevented him from confronting Mr. Gilliam or aiding in his cross-examination.  The Court of Criminal Appeals did not address whether or not the introduction of Mr. Gilliam's testimony violated the Confrontation Clause.  Instead, the Court of Criminal Appeals, in essence, found the testimony to be harmless:

> Gilliam's testimony, which is less than four pages long, revealed that he had sold the .25 caliber gun to ShisInday for $50.  There was other evidence that linked ShisInday to the gun – the gun was found covered in blood in ShisInday's car, other witnesses testified that the gun used in the murder belonged to ShisInday, and ShisInday confessed to shooting the victim with that gun.  We need not determine whether admission of Gilliam's testimony violated ShisInday's Sixth Amendment right to confront his witnesses because the testimony was cumulative and did not contribute to ShisInday's conviction.

Opinion on Direct Appeal, at 32.[19]

Respondent argues that the admission of Mr. Gilliam's testimony was harmless.[20]

---

[19]     The Court of Criminal Appeals relied on TEX. R. APP. PRO. 44.2 in denying this claim:

> If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

Respondent does not argue that the Court of Criminal Appeals' harmless-error analysis is subject to AEDPA deference; Respondent does not argue that the state-court decision was consistent with or a reasonable application of federal-harmless error law.  Because ShisInday cannot succeed on federal review unless the error were harmless even if he met the AEDPA standards, *see Robertson*, 324 F.3d at 304, this Court will focus on the undiluted federal harmless error standard from *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

[20]     Respondent also argues that the Confrontation Clause did not prohibit the admission of Mr. Gilliam's testimony.  In ShisInday's first federal hearing, the district court noted, in the
(continued...)

Federal habeas relief is generally unavailable for harmless errors.  *See Robertson*, 324 F.3d
at 304.  "Confrontation Clause errors [are] subject to . . . harmless-error analysis." *Delaware
v. Van Arsdall*, 475 U.S. 673, 684 (1986).  Under *Brecht v. Abrahamson*, 507 U.S. 619,
637-38 (1993), a defendant must show that the error resulted in "actual prejudice."  Actual
prejudice is present if the error "had substantial and injurious effect or influence in
determining the jury's verdict." *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750,
776 (1946)).  To determine whether Confrontation Clause error was harmless, the Fifth
Circuit

> consider[s] the importance of the witness' testimony in the prosecution's case,
> whether the testimony was cumulative, the presence or absence of evidence
> corroborating or contradicting the testimony of the witness on material points,
> the extent of cross-examination otherwise permitted, and of course, the overall
> strength of the prosecution's case.

*United States v. Edwards*, 303 F.3d 606, 623 (5th Cir. 2002) (quoting *Hafdahl v. Johnson*,
251 F.3d 528, 539-40 (5th Cir. 2001)).[21]

---

[20]        (...continued)
context of an incompetency-to-be-executed claim, that the trial court found that ShisInday was
competent at his first trial.  Based on that finding, Respondent maintains that ShisInday had the full
ability to exercise his Confrontation Clause rights.  As the state decision focused on harmless error,
this Court will likewise limit its discussion to that issue.

[21]        ShisInday extensively cites to *Crawford v. Washington*, 541 U.S. 36 (2004).
*Crawford* held that out-of-court testimonial statements are *per se* inadmissible against a criminal
defendant unless the defendant has had a prior opportunity to cross examine the declarant.  However,
"*Crawford* does not apply retroactively on federal habeas." *In re Brown*, 457 F.3d 392, 395 (5th Cir.
2006) (relying on *Lave v. Dretke*, 444 F.3d 333, 334-36 (5th Cir. 2006)), *cert. denied*, ___ U.S. ___,
126 S. Ct. 1434 (2006); *see also Whorton v. Bockting*, ___ U.S. ___, S. Ct. ___, No. 05-595 (Feb.
28, 2007) (finding that *Crawford* does not apply retroactively).  As ShisInday's direct appeal
concluded before the Supreme Court handed down the *Crawford* opinion, this Court cannot apply
(continued...)

ShisInday incorrectly argues that "Gilliam's testimony was the only evidence that tied the gun to ShisInday[.]" (Docket Entry No. 18 at 31).  The police found the gun covered in blood on the driver's side in ShisInday's car.  Three other trial witnesses testified that they saw ShisInday with the weapon.  Martha Tarver (the girlfriend of Zendal Peels' father), Tr. Vol. 15 at 55-56; Doyle Peels, Tr. Vol. 15 at 97; and Doyle's friend Ronald McHenry, Tr. Vol. 15 at 119-20, each linked ShisInday to the murder weapon.  ShisInday seeks to distinguish Mr. Gilliam's testimony from the other testimony associating him with the gun by arguing that he was the only witness who "was not biased" and "not related in any way to the parties." (Docket Entry No. 31 at 20).  The same, however, can be said of Ronald McHenry who saw the gun in ShisInday's car the day of the murder and was not related to other witnesses.  Tr. Vol. 15 at 119-20.  Competent other testimony showed that ShisInday was the owner of the murder weapon and that he had it in his possession on the day of the murder.[22]  Mr. Gilliam's testimony added nothing new to the jury's consideration of ShisInday's role in the murder.

Importantly, ShisInday offers no compelling area in which he could have cross-

---

[21]      (...continued)
its principles to ShisInday's claim.  In any event, ShisInday had a full opportunity to cross-examine Mr. Gilliam in the first trial, though he now claims otherwise.

[22]      ShisInday argues that Mr. Gilliam's "testimony was used to establish not only that ShisInday possessed a gun, but that in fact purchased a gun, the same one identified as the alleged murder weapon." (Docket Entry No. 31 at 19-20).  Whether ShisInday acquired his gun through purchase, gift, or some other means bore no material relationship to the charges against ShisInday. The value in Mr. Gilliam's testimony was in linking ShisInday to the weapon, not in establishing the manner in which ShisInday acquired the weapon.

examined Mr. Gilliam differently than his attorneys did in the first trial.  ShisInday makes

no showing that deeper cross-examination of Mr. Gilliam in the second trial would have

lessened the incriminating nature of his testimony.  The Court finds that, even if the

introduction of Mr. Gilliam's testimony violated the Confrontation Clause, that error did not

have a substantial and injurious effect or influence in determining the jury's verdict.

### III.    Double Jeopardy and Collateral Estoppel (claims 6, 7, and 8).

ShisInday raises three claims which assert that his retrial after the initial round of

federal habeas review violated the Constitution.  First, ShisInday contends that Texas' failure

to abide by all the terms of the stipulation it entered into during his first habeas proceedings

created a situation where retying him unconstitutionally placed him twice in jeopardy,

particularly since he had already served a lengthy sentence under his first conviction (claim

six).[23]  Second, ShisInday claims that the due process clause should have prevented the

prosecution from relying on a theory it had abandoned in his first trial (claim seven).  Third,

ShisInday argues that collateral estoppel also should have barred the prosecution from relying

on an abandoned theory (claim eight).

### A.    Double Jeopardy for Failing to Comply with the Stipulation (claim 6)

On July 2, 1997, the district court set aside ShisInday's conviction.  The attorney

---

[23]    The Court takes judicial notice of the record developed when ShisInday challenged
the State's compliance with the stipulation in a federal civil rights lawsuit.  *ShisInday v. Johnson*,
H-97-CV-3894 (S. D. Tex.), *aff'd*, CA-99-21145 (5th Cir. Sep. 11, 2000).  This Court's review of
the facts surrounding the stipulation come from the current record and those developed in
ShisInday's civil rights action.

general's office filed an untimely motion under FED. R. CIV. P. 59(e).  After the denial of the

Rule 59(e) motion, the attorney general's office filed a notice of appeal believing that the

post-judgment motion tolled the time to appeal.  ShisInday filed a cross appeal.  On October

21, 1997, the Fifth Circuit dismissed the attorney general's appeal as untimely.  On October

24, 1997, ShisInday entered into a stipulation with the attorney general's office that provided

for ShisInday's release in return for dismissal of the cross-appeal.  The parties filed the

stipulation with the Fifth Circuit on October 30, 1997.  On November 4, 1997, the Fifth

Circuit dismissed ShisInday's appeal.

ShisInday never entered free society.  On October 30, 1997, the assistant attorney

general who signed the stipulation contacted the chairman of the Texas State Classification

Committee and told him not to release ShisInday from custody because of future trial

proceedings in Harris County.  On November 5, 1997, the 180th District Court of Harris

County issued a bench warrant for ShisInday's arrest.  The State of Texas transferred

ShisInday to the Harris County Jail on December 5.[24]

In the state district court, ShisInday moved to set aside the indictment based on the

due process clause.  He complained that his retrial violated the double jeopardy clause

because he engaged in a "quid pro quo" stipulation that guaranteed his release from custody.

Tr. Vol. 4 at 15.  ShisInday feared that he could not adequately defend himself against a

---

[24]     ShisInday filed a pre-trial state habeas application seeking to effectuate his release
as a term of the stipulation.  The Texas intermediate appellate court found the application moot after
his retrial.  *See ShisInday v. State*, 1998 WL 880958 (Tex. App. – Houston [14th Dist.] 1998, pet.
ref'd).

38

retrial after serving such a long sentence.  Tr. Vol. 4 at 17.  The trial court summarily denied

his ShisInday's objections to retrial.

On direct appeal, the Court of Criminal Appeals found that "[n]owhere does the

stipulation bind the State of Texas from retrying ShisInday or prevent county authorities from

taking ShisInday into custody. . . .  Because ShisInday's conviction was not reversed on the

basis of insufficient evidence, there was no legal impediment to the State's retrying

ShisInday for the offense."  Opinion on Direct Appeal, at 7-8.  When ShisInday reasserted

his double jeopardy claim on state habeas review, the state habeas court imposed Texas'

procedural law to bar consideration of the merits anew, but in the alternative found that

ShisInday's "re-trial was not barred by either double jeopardy or the Attorney General's

stipulation of dismissal."  State Habeas Record at 2152-53, ¶¶ 1-2.

Nothing in federal law prevented ShisInday's retrial after the dismissal of his federal

habeas action.  The Double Jeopardy Clause of the Fifth Amendment commands that "[n]o

person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb."

The protection against double jeopardy is "clearly 'fundamental to the American scheme of

justice.'"  *Benton v. Maryland*, 395 U.S. 784, 796 (1969) (quoting *Green v. United States*,

355 U.S. 184, 187 (1969)).  The Fifth Amendment guarantee against double jeopardy

consists of "three separate constitutional protections.  It protects against a second prosecution

for the same offense after acquittal.  It protects against a second prosecution for the same

offense after conviction.  And it protects against multiple punishments for the same offense."

*North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (footnote omitted).  Nevertheless, "the Double Jeopardy Clause 'imposes no limitations whatever upon the power to retry a defendant who has succeeded in getting his first conviction set aside[.]'"  *Tibbs v. Florida*, 457 U.S. 31, 40 (1982) (quoting *Pearce*, 395 U.S. at 720); *see also Sattazahn v. Pennsylvania*, 537 U.S. 101, 109 (2003) ("[T]he touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.'"); *Shute v. State of Texas*, 117 F.3d 233, 238 (5th Cir. 1997) ("Generally, if a defendant obtains a reversal of his conviction, double jeopardy does not bar a retrial.  If the conviction is reversed for insufficient evidence of guilt, however, double jeopardy does bar retrial.  This is because a finding of insufficient evidence of guilt means that the trial court should have entered a judgment of acquittal, which would have barred retrial.").  The only exception to this rule exists when "'the reviewing court has found the evidence legally insufficient' to support conviction."  *Tibbs*, 457 U.S. at 40-41 (quoting *Burks v. United States*, 437 U.S. 1, 18 (1998)).

ShisInday seeks to create a new category of cases in which double jeopardy bars retrial when the prosecution fails to honor completely the terms of the dismissal of his first action.  Simply, ShisInday sees the stipulation as a get-out-of-jail-free card which, while initially authorizing temporary release, has now become permanent.  Nothing in Supreme Court jurisprudence authorizes the extension of double jeopardy principles in that manner.

ShisInday has already once litigated the question of the release from TDCJ custody

in federal court, though in a different context.  In 1997, ShisInday filed a civil rights action pursuant to 42 U.S.C. § 1983 based on the fact that he was transferred to Harris County custody, not released from custody, after the parties entered into the stipulation.  *ShisInday v. Johnson*, No. 97-CV-3894 (S. D. Tex.).  ShisInday asked the federal district court to enforce the parties' stipulation of dismissal or compensate him for the breach of that agreement.  The federal district court dismissed that claim for a lack of subject matter jurisdiction. The Fifth Circuit Court of Appeals affirmed that holding on appeal.  *ShisInday v. Johnson*, No. 99-21145 (5th Cir. Sep. 11, 2000) (unpublished).

In conjunction with its holding, the Fifth Circuit noted that "[i]t appears that ShisInday's continued confinement after November 4 (or even October 30) was not a constitutional violation in light of the impending bench warrant, even though [the Director of Texas Department of Criminal justice, Institutional Division] had previously signed the stipulation agreement providing for ShisInday's immediate release."  *Id.* at 9.  The Fifth Circuit held that

> particularly in light of [the chairman of the State Classification Committee's] knowledge that Harris County's impending warrant charged ShisInday with capital murder, it apparently would have been unreasonable to have released ShisInday so hastily.  Once the Harris County warrant was issued, of course, [Texas] clearly was correct to keep ShisInday in custody until Harris County officials took him.

*Id.* at 10.  The Fifth Circuit also explicitly found that "the stipulation of dismissal only prohibited the state from seeking judicial review of the final order entered in ShisInday's federal habeas action, and therefore did not prohibit Harris County from seeking a new

41

conviction." *Id.* at 11 n.8.  The Fifth Circuit's reasoning applies with the same force in these proceedings.

Because the results of ShisInday's successful habeas action did not call into question the sufficiency of the evidence against him, the State of Texas was free to try him again for the victim's murder.  Nothing in the stipulation itself or in federal law creates a double jeopardy exemption if the State transferred him to county custody without any immediate or intervening release.  ShisInday has not shown that the state court's determination on this claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

B.    Double Jeopardy and Collateral Estoppel Bar to Trial Theories Available to the Prosecution (claims 7 and 8)

During ShisInday's first trial the prosecution accused him of being the one who shot the victim.  In his second trial, the prosecution proceeded under the theory that, if ShisInday was not the principal actor, he at least acted as a party.[25]  ShisInday reasons that the prosecution "abandoned" that theory in his first prosecution so that its emergence in the second trial violated principles of double jeopardy and collateral estoppel.

ShisInday raised this claim on state habeas review.[26]  The state habeas court found that

---

[25]    Under Texas law, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."  TEX. PENAL CODE § 7.01(a).

[26]    In a separate claim on direct appeal, ShisInday claimed that the trial court should not have instructed the jury on the law of the parties because the State did not properly notify him that

(continued...)

the "1981 indictment does not contain a parties allegation, and that the State did not request a parties charge in [ShisInday's] 1982 trial." State Habeas Record at 2151, ¶197. The court also found that in the second trial "the trial court charged the jury on the law of the parties based on the evidence presented at trial." State Habeas Record at 2151, ¶198. However, the state habeas court found that "the State's actions not to seek a parties charge in 1982 do[] not constitute an abandonment of an 'allegation' and that principles of double jeopardy and collateral estoppel are not applicable to the trial court's charging the jury on the law of the parties in [his] 1998 re-trial." State Habeas Record at 2151, ¶200. The state habeas court concluded that the trial court properly delivered a parties charge. State Habeas Record at 2187, at ¶ 134.

ShisInday cannot succeed on this claim. ShisInday does not point to any federal or state law preventing reliance on the law of the parties when the initial trial focused on a defendant's liability as the principal actor. In his summary judgment response, ShisInday

---

[26]      (...continued)
they would proceed on that theory. The Court of Criminal Appeals held as follows:

> We have consistently held that 'if the evidence supports a charge on the law of parties, the court may charge in the law of parties even though there is no such allegation in the indictment or information. Further, when the evidence supports both primary and party theories of liability, the trial court does not err in submitting a parties instruction. Here, the evidence established that both Zendal Peels and ShisInday were involved in kidnapping Harrison and disposing of her body. Therefore, the evidence supports a finding that ShisInday acted both as a principal and a party to Zendal's conduct. Accordingly, the court did not err by including a parties instruction in the charge.

Opinion on Direct Appeal, at 45-46.

"acknowledges that the party charge is not plead [*sic*], and is not required to be plead [*sic*], in the indictment, it is a theory that the State did not pursue at the first trial."  (Docket Entry No. 31 at 22).   ShisInday argues that double jeopardy or collateral estoppel binds the prosecution to reliance on those theories of guilt presented in the first trial, but he provides no persuasive federal law to support that argument.[27]  ShisInday has not shown that by abandonment, verdict, or judicial holding any issue was decided in his first trial that would trigger double jeopardy or equitable principles to prohibit his conviction as a party in his second trial.  ShisInday has failed to show that the state court's review of his parties liability prosecution was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

## IV.   Constitutionality of ShisInday's Arrest, Confession, and Seizure of Evidence (claims 9 though 12).

ShisInday challenges his arrest and subsequent confession.  ShisInday first alleges that the police violated the Fourth, Fifth, and Fourteenth Amendments by arresting him while he sought treatment at a hospital (claim nine).  Based on the allegedly illegal arrest, ShisInday

---

[27]     ShisInday cites to *Zedner v. United States*, ___ U.S. ___, 126 S. Ct. 1976 (2006), which noted that "judicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *Id.* at 1987 (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)) (emphasis added).  The Fifth Circuit has rejected judicial estoppel as a ground for habeas relief, noting that "there is no indication . . . that it is constitutionally mandated" and "has apparently never been applied against the government in a criminal case."  *Nichols v. Scott*, 69 F.3d 1255, 1272 (5th Cir. 1995); *see also United State v. Ayala*, 107 Fed. App'x 410, 413 (5th Cir. 2004) ("Courts have frowned upon application of the doctrine of judicial estoppel in the criminal context and we see no reason to bind the government to its earlier concession.").

argues that the trial court should have suppressed evidence the police recovered from his car (claim ten). He also contends that the police secured his confession through coercive means (claim eleven).   Finally, he faults the trial court for not allowing the jury to determine whether his confession was voluntary (claim twelve).

The state courts comprehensively considered the factual basis for these claims and addressed their merits.   ShisInday does not challenge any specific factual finding made by the state courts other than generally to dispute the unfavorable result.   This Court, therefore, will rely on the Court of Criminal Appeals' recitation of the facts surrounding his arrest and confession:

> [A]round 5 p.m. on July 18, 1981, ShisInday went to the emergency room of John Sealy Hospital in Galveston, Texas, seeking psychiatric help.   Between 10 p.m. and 1 a.m. Dr. Kayla Paul, a psychiatric intern, conducted a psychiatric examination and history of ShisInday.   ShisInday appeared coherent, did not appear to be under the influence of drugs or alcohol, understood the questions, and responded appropriately.   But Dr. Paul noted that ShisInday appeared tired, anxious, and sad.   ShisInday told her that someone had told him that he had committed a crime, but he apparently could not recall the circumstances. Instead, he told her a story about killing a dog.   ShisInday recounted meeting the victim the previous day and helping her with her car.   Then he and his friend went to the victim's house for beer.   After leaving her house, ShisInday hit a dog with his car.   He pulled the dog into his car and, noting that it was injured and suffering, shot the dog in the head.   Fearing that the dog's owner would discover what he had done, ShisInday tied some rocks to the dog and dumped it in the San Jacinto river.   ShisInday also reported that he had not slept in three days or eaten in two.   But he contradicted this when he told Dr. Paul that, after his encounter with the dog, he went to his friend's house and slept until morning.
>
> Dr. Paul further testified that on the night she examined ShisInday she received a call from Detective Nixon of the Harris County Sheriff's Department, ordering security guards be posted outside ShisInday's hospital room to

prevent him from leaving.  Sergeant Ivan Isbell with the UTMB police arrested ShisInday at the hospital around 1:00 a.m. on July 19, 1981, and transported him to the Galveston jail.  Around 2:00 a.m., a Harris County district judge signed a warrant for ShisInday's arrest for aggravated kidnapping.  Detectives Nixon and Freeze delivered a copy of the warrant to the Galveston jail and at around 4:00 or 5:00 a.m. went to the hospital to speak with Dr. Paul.  Dr. Paul informed them of the location where ShisInday had described dumping the dog.  The police found the victim's body in that location.

At around 9:00 a.m., Nixon and Freeze took ShisInday to Alta Loma to receive the magistrate's warnings and then returned him to the jail.  After making arrangements to have ShisInday's car towed to Harris County, the detectives picked ShisInday up from the jail around noon and took him to Harris County jail.  On the way, ShisInday expressed to the detectives his fear that they or the police were going to beat him.  He explained that guards and inmates at Angola prison in Louisiana had beaten him before and he was apprehensive about being beaten again.  Nixon and Freeze assured ShisInday several times that he would not be beaten.  During this drive, ShisInday told the detectives his story about the dog.

After they arrived in Houston and ShisInday was processed, he agreed to speak with Nixon in an interview room.  Nixon did not repeat the *Miranda* warnings to ShisInday, but reminded him of the warnings that he had received from the magistrate.  ShisInday repeated the dog story.  When Nixon showed ShisInday pictures of the victim in the morgue, ShisInday burst into tears.  Disgusted, Nixon terminated the interview and asked Freeze to take ShisInday to the jail located in the basement of the building.  On the elevator, ShisInday told Freeze that he was ready to make a confession, and the two returned to the interview room.  ShisInday's oral confession was transcribed between 4 p.m. and 10:30 p.m.  The statement was nine pages long and took six hours to transcribe because ShisInday made numerous changes.  ShisInday went so far as to correct a grammatical element in the standard form language.  ShisInday read and initialed the *Miranda* warnings appearing at the top of the page and signed the original and five copies of the statement.  ShisInday's only question related to the meaning of the word "intelligently" in the context of the form language following the Miranda warnings "  .  .  .  I knowingly, intelligently and voluntarily waive the rights set out above and make the following voluntary statement."  Nixon explained that "intelligently" meant that he understood what he was saying and the consequences of making the statement.  ShisInday responded that he did understand and wanted to make the statement.

According to Nixon, ShisInday appeared to understand everything during the interview and articulated details of the crime "extremely well."

During the interview, ShisInday was given clean clothes to wear because he was still wearing the clothes he had on during the offense, and the sweat and blood were beginning to emit a foul odor.  ShisInday was given food, drinks, and cigarettes, and had full access to the bathroom.

Opinion on Direct Appeal, at 13-15.  This Court must decide whether federal habeas review or relief is available on ShisInday's challenges relating to his arrest and confession.

A.     ShisInday's Fourth Amendment Claims

ShisInday claims that the police lacked probable cause to arrest him without a warrant because they did not verify Zendal Peels' accusation before the arrest.  On that basis, ShisInday argues that "[u]nder the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, all evidence recovered as a result of this arrest and any statements made by ShisInday following the arrest are 'fruit of the poisonous tree,' and should have been suppressed."  (Docket Entry No. 18 at 51).  Binding federal law prevents this Court from considering the merits of ShisInday's Fourth Amendment claims.

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976) (footnote omitted).  The existence of state processes allowing an opportunity for full and fair litigation of Fourth Amendment claims, rather than a defendant's use of those processes, serves the policies underlying the

exclusionary rule and bars federal habeas corpus consideration of claims under *Stone*.  *See Caver v. State of Alabama*, 577 F.2d 1188, 1192-93 (5th Cir. 1978).  The *Stone* bar "applies to all claims arising under the Fourth Amendment," including challenges to an arrest or the seizure of evidence.  *Hughes v. Dretke*, 412 F.3d 582, 596 (5th Cir. 2005), *cert. denied*, ___ U.S. ___, 126 S. Ct. 1347 (2006).

ShisInday seeks to skirt *Stone*'s constraints by alleging that he did not have a full and fair opportunity to develop this issue in state court.  ShisInday does not argue that the trial court ignored his Fourth Amendment claims, but objects to the timing and results of the trial court's suppression hearing.  ShisInday argues that he "was not able to obtain a fair hearing because the hearing did not take place until after the capital qualified jury was sworn in and the evidence began and the court had no choice to rule the evidence admissible."  (Docket Entry No. 31 at 24).  Respondent contends that the trial court could not hold a suppression hearing until the trial started because "ShisInday first challenged the legality of his arrest and confession during trial."  (Docket Entry No. 21 at 41).  ShisInday first filed a motion to suppress months before trial, Trans at 202-04, though it does not appear that the trial court acted on that motion.  Still, the trial court allowed ShisInday an opportunity to present his Fourth Amendment challenge.  ShisInday has not pointed to any law that requires a trial court to consider the admissibility of evidence before the jury was selected and sworn.

ShisInday had an opportunity to present his claims at trial – an opportunity of which he took full advantage.  ShisInday then availed himself of a full and fair opportunity to

present his claims to the Court of Criminal Appeals.  On direct appeal, the Court of Criminal Appeals refused to consider portions of ShisInday's argument because he did not raise them in the trial court, but generally found that ShisInday's arrest and confession met Fourth Amendment standards.  ShisInday contends that his disagreement with the appellate ruling should get him around the *Stone* bar.  However, even "[e]rrors in adjudicating Fourth Amendment claims are not an exception to *Stone*'s bar."  *Moreno v. Dretke*, 450 F.3d 158, 167 (5th Cir. 2006), *cert. denied*, ___ U.S. ___, 127 S. Ct. 935 (2007); *see also Swicegood v. Alabama*, 577 F.2d 1322, 1324-25 (5th Cir. 1978).  The Fifth Circuit has emphasized that the "'opportunity for full and fair litigation' [means] just that: 'an opportunity.'"  *Janecka v. Cockrell*, 301 F.3d 316, 320 (5th Cir. 2002) (quoting *Caver*, 577 F.2d at 1192).  "[A]bsent additional allegations that state processes routinely or systematically are applied in such a way as to prevent the actual litigation of Fourth Amendment claims, mistakes that thwart the presentation of Fourth Amendment claims do not render the *Stone* bar inapplicable."  *Janecka*, 301 F.3d at 321.  Disagreement with the outcome does not remove the *Stone* bar.

Because ShisInday took advantage of the opportunity to present his claims in state court, *Stone* requires this Court to forgo a renewed analysis of ShisInday's Fourth Amendment claims.  This Court will not address whether ShisInday's arrest, confession, and subsequent seizure of evidence met Fourth Amendment standards.[28]

---

[28]     In the alternative, the Court of Criminal Appeals found that "[a] warrant is not required when an arrest is supported by probable cause and is made in a public place where the arrestee lacks a reasonable expectation of privacy."  Opinion on Direct Appeal, at 20.  The Court of
(continued...)

B.     Fifth Amendment Claims

Under the Fifth Amendment, ShisInday also contends that the trial court should have suppressed his confession and any evidence gathered by the police because a coercive atmosphere made his statements involuntary.  ShisInday contends that he did not knowingly and voluntarily confess because (1) his mental illness made him unable to appreciate the waiver of his rights; (2) the police threatened him with violence; (3) the police interrogated him for a prolonged period; and (4) the use of gruesome autopsy photographs overcame his will.  ShisInday has not shown that the trial court improperly admitted his confession into evidence.

"A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice."  *United States v. Broussard*, 80 F.3d 1025, 1033 (5th Cir. 1996).  "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[.]."  *Oregon v. Elstad*, 470 U.S. 298, 305 (1985).  "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  That having been said, it must be remembered that "[c]ases in

---

[28]        (...continued)
Criminal Appeals correctly found that the information Zendal Peels gave the police, in conjunction with the fact that ShisInday told Dr. Paul that people accused him of committing a murder, gave the police probable cause for his arrest.  As discussed above in the Fifth Amendment context, nothing about the circumstances surrounding ShisInday's confession violated his constitutional rights.

which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984); *see also Dickerson v. United States*, 530 U.S. 428, 443 (2000).

"The voluntariness of a confession is ultimately a legal determination" that "may also involve subsidiary factual determinations and mixed issues of law and fact." *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998) (citations omitted). State courts unequivocally found that ShisInday's account of the circumstances surrounding his confession was not credible. The trial court issued findings and facts and conclusions of law after the evidentiary hearing. The trial court found that (1) the police did not coercively abuse, threaten, or promise ShisInday anything in return for his confession; (2) ShisInday was lucid and could understand the nature of his confession; (3) ShisInday did not experience any delusion, hallucination, or effects of mental illness while confessing; (4) the police did not deprive ShisInday of food or sleep; and (5) ShisInday did not invoke his right to silence or request an attorney's assistance. Opinion on Direct Appeal, at 17.

On direct appeal, ShisInday again challenged the admission of his confession. ShisInday particularly emphasized testimony from the suppression hearing detailing his history of mental illness. The Court of Criminal Appeals summarized that testimony as follows:

> At the hearing, the defense presented the testimony of Dr. Robert Sarmiento, a psychologist who gave ShisInday several tests in 1981 and 1982. Dr.

Sarmiento testified that ShisInday has an IQ of 91, in the low end of average range, had a 4.7 grade level in reading and a 3.9 grade level in spelling. ShisInday's deficient academic achievements led Dr. Sarmiento to conclude that ShisInday had not developed these skills to his intellectual potential. Sarmiento also concluded that ShisInday suffers from fairly severe mental disorders, impairing his ability to make sound judgments and resulting in disturbed thought processes and disorganized thinking.   After reviewing ShisInday's personal history, Sarmiento determined that ShisInday suffers from atypical paranoid schizophrenia.   Sarmiento concluded that ShisInday's mental disorders probably prevented his understanding the *Miranda* warnings and "quite likely" impaired his judgment to waive his rights.   But on cross-examination Sarmiento admitted that he had no evidence to say with certainty that ShisInday did not understand the warnings before he confessed.

Opinion on Direct Appeal, at 15-16.  The Court of Criminal Appeals rejected ShisInday's

assertion that his mental impairments rendered him unable to appreciate the waiver of his

rights:

Although ShisInday's psychological expert testified that ShisInday probably could not understand the warnings, evidence of the circumstances surrounding ShisInday's statement demonstrates otherwise.   There was no indication that ShisInday did not understand the *Miranda* warnings – he inquired about the use of the word "intelligently," corrected a grammatical element in the standard form language, expressed his desire to make the statement, and then provided a lengthy, detailed statement to which he made numerous corrections. Indeed, it was ShisInday's repeated changes to the statement that apparently extended the transcription process. Further, Nixon testified that ShisInday was given food and drink when he requested it.  Finally, it was during the car ride to Houston that ShisInday expressed his fear of being beaten, and both Nixon and Freeze assured him that he would not be harmed.   After the car ride, ShisInday never raised that concern again.

Although ShisInday sought psychiatric help at the hospital after committing the crime, Dr. Paul noted that ShisInday was lucid and oriented.   ShisInday's self-reported auditory hallucinations and out-of-body experiences had occurred in the past and, according to ShisInday, had not happened during the commission of the crime.

> Because the record does not indicate that ShisInday was unable to understand the *Miranda* warnings or that the State utilized coercive tactics designed to overbear ShisInday's will, we will defer to the trial court's findings that ShisInday knowingly waived his rights and that his confession was both voluntary and admissible.

Opinion on Direct Appeal, at 17-18.

The state courts found that ShisInday voluntarily and knowingly confessed without threats or coercion. This Court must honor that factfinding on federal review unless ShisInday proves otherwise by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). ShisInday has not met his AEDPA burden to rebut the presumptively correct finding that the police did not coerce his confession. There is no evidence of coercive or improper police activity. As noted by Respondent, "the circumstances surrounding ShisInday's confession involve standard police practices and do not rise to the level of coercive state action due to the indisputable fact that ShisInday was given oral and written *Miranda* warnings as evidenced by the credible testimony of several witnesses and ShisInday's own acknowledgment that he initialed and signed the written confession." (Docket Entry No. 21 at 50). The record suggests that, while ShisInday has experienced mental illness in his life, he was lucid at the time he confessed. The police did not create a coercive atmosphere, provided comfortable surroundings, and met ShisInday's physical needs. ShisInday repeatedly received and waived his *Miranda* warnings. ShisInday has not met his AEDPA burden in showing that police coercion rendered his confession involuntary.

C.      Failure to Have the Jury Decide the Voluntariness of his Confession (claim 12)

ShisInday complains that the trial court violated "his constitutional right to have any defense presented to the jury" by not allowing the jury to decide whether he intelligently and voluntarily confessed.  (Docket Entry No. 18 at 60).  Under TEX. CODE CRIM. PRO. article 38.23(a),

> [n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.  In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

As a matter of state law, ShisInday was entitled to an article 38.23 instruction only if the circumstances raised a factual issue concerning whether the police obtained evidence in violation of federal or state law.  *See Thomas v. State*, 723 S.W.2d 696, 707 (Tex. Crim. App. 1986).  ShisInday argues that this Court should reverse his conviction because the jury did not consider the admissibility of his confession.

ShisInday raised this claim on direct appeal.  The Court of Criminal Appeals found that he had inadequately briefed the claim.  Opinion on Direct Appeal at 43-44.  Specifically, the Court of Criminal Appeals found that ShisInday did not point to any place in the record where he requested that the trial court instruct the jury under article 38.23(a).  On state habeas review, ShisInday provided greater detail regarding his claim, but based his argument

entirely on the operation of state law.  State Habeas Record at 255-58.[29]  Respondent now argues that ShisInday has not exhausted the federal aspects of his jury instruction claim.

Federal habeas law requires the exhaustion not only of factual issues, but also of any legal argument.  *See Kittelson v. Drteke*, 426 F.3d 306, 315 (5th Cir. 2005).  ShisInday's state court briefing on this issue did not invoke, mention, or infer reliance on the federal constitution as a basis for overturning his conviction because of the alleged jury charge error. While habeas law does not require petitioners to make precisely identical arguments in both forums, a petitioner must make the state courts aware that he challenges his conviction or sentence under the federal constitution.  *See Baldwin v. Resse*, 541 U.S. 27, 33 (2004). Because ShisInday did not allow the state courts an opportunity to determine whether federal due process clause protections required the instruction, his claim is unexhausted.  Texas' stringent abuse-of-the-writ doctrine acts to procedurally bar this claim from federal consideration and ShisInday makes no attempt to excuse his failure to exhaust.

Even if ShisInday exhausted this claim, he cannot prevail.  While ShisInday's response to the pending summary judgment motion clarifies that he "was denied his right to a fair trial under the Due Process Clause," the essence of his claim invokes state, not federal, law.  (Docket Entry No. 31 at 26).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review,

---

[29]     The state habeas application pointed out that trial counsel requested that the jury be instructed that it could disregard the confession if taken in violation of his constitutional rights.  Tr. Vol. 21 at 7-9.

a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (internal quotation omitted); *see also Bradshaw v. Richey*, ___ U.S. 74, ___, 126 S. Ct. 602, 604 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.").  Nothing in federal law requires a state jury to decide the voluntariness of a criminal defendant's confession.  The only question available on federal review, therefore, is whether the alleged state-law error "by itself so infected the entire trial that the resulting conviction violates due process"  *McGuire*, 502 U.S. at 72.  As a review of the facts surrounding his confession reveals, the trial court could reasonably find no justifiable challenge to ShisInday's confession that would require submission of the issue to the jury.  Had ShisInday exhausted this claim, it would not merit habeas relief.

## V.    Presentation of An Extraneous Offense (claim 13).

During the guilt/innocence phase of trial, the prosecution adduced testimony that ShisInday contends violated his constitutional rights.  Doyle Peels and Ron McHenry both testified that while ShisInday drove them to a skating rink on the day of the murder, he pulled out the murder weapon and pointed it at a police officer.  Tr. Vol. 15 at 97-98, 122-23. ShisInday objected to this testimony at trial by arguing that it constituted extraneous offense evidence under Texas Rules of Evidence 404(b) and was more prejudicial than probative under Rule 403.  Tr. Vol. 15 at 95, 120.  The prosecution countered that the testimony only served to establish that ShisInday "was in possession of the gun, [it] was his gun, he's the

person who used the gun or handled the gun at that particular time." Tr. Vol. 15 at 95. ShisInday now argues that, because this testimony was cumulative of other testimony which tied him to the weapon and also more prejudicial than probative, the testimony was fundamentally unfair in violation of the due process clause.

Respondent argues that this claim lacks procedural adequacy and substantive merit. When ShisInday raised this claim on direct appeal, he only cited state law; ShisInday never raised any federal constitutional objection to the evidence in state court. Respondent properly recognizes that ShisInday's reworking of the claim into a federal one runs afoul of the exhaustion doctrine. ShisInday never gave the state courts an opportunity to decide whether the federal constitution would exclude testimony that he brandished a gun at a police officer. The unexhausted nature of this claim bars the Court from granting habeas relief.

Moreover, Respondent contends that any federal argument on this claim is not cognizable because it is inherently a matter of state, not federal, law. While Respondent contends that challenges to state evidentiary decisions are not cognizable on federal habeas review, such claims merit some degree of federal consideration, though under highly demanding standards. True, federal habeas courts do not "sit to review the mere admissibility of evidence under state law." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998). Nevertheless, habeas relief may lie if a state court's evidentiary rulings are so extreme in their error that they result in fundamental unfairness. *See id.*; *Hafdahl*, 251 F.3d at 536 ("If evidence of an extraneous offense is wrongly admitted, however, habeas corpus

relief is proper only if the error is of such magnitude that it resulted in 'fundamental unfairness.'")).  A federal court cannot "provide collateral relief simply because the state court's challenged conduct would have led to reversal if the defendant had been tried in the federal system; nor is relief authorized even if state evidentiary rules appear to have been violated."  *Blankenship v. Estelle*, 545 F.2d 510, 516 (5th Cir. 1977).  As noted by the Fifth Circuit,

> '[F]or an otherwise valid state conviction to be upset years later on federal habeas, surely something more than an evidentiary mistake must be shown.  If mistake is enough, then never, simply never, will the process of repeated, prolonged, postconviction review cease.  For in every trial, or at least nearly every trial, there will be, there are bound to be, some mistakes.  What elevates the 'mistake' to a constitutional plane is at least two-fold. First, the mistake must be material in the sense of a crucial, critical, highly significant factor. Second, it must have some State complicity in it.'

*Shaw v. Estelle*, 686 F.2d 273, 275 (5th Cir. 1982) (quoting *Luna v. Beto*, 395 F.2d 35 (5th Cir. 1968) (Brown, C. J., specially concurring)).  The relevant inquiry on federal habeas review if "the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial[.]" *Little*, 162 F.3d at 862.

Even assuming that ShisInday is correct that the trial court should not have allowed witnesses to testify relating to his brandishing of a weapon on the day of the murder, that testimony was not crucial, critical, or highly significant at trial.  On direct appeal, the Court of Criminal Appeals explained that the testimony "demonstrated ShisInday's ownership and control of the murder weapon" and "seemed to corroborate ShisInday's admission in his written statement that he was the one who shot Harrison."  Opinion on Direct Appeal, at 39.

58

The state courts decided that the probative value of that evidence exceeded its prejudicial nature.  As other admissible evidence not only showed ShisInday's guilt but also his possession and control over the gun, the Court finds that the guilt/innocence phase "extraneous offense" evidence was merely cumulative.  The prejudicial effect of the jury knowing that ShisInday waived his pistol at a police officer would not be highly significant or critical.  Nothing in the record suggests that the witnesses' testimony rendered his trial fundamentally unfair.  This claim is denied.

**VI.    Ineffective Assistance of Counsel (claims 14 and 23).**

ShisInday raises two claims accusing his prior attorneys of deficient representation. First, ShisInday complains that trial counsel should have requested a jury instruction that would have allowed the jury to find that his intoxication on the day of the murder made him temporarily insane (claim 14).  Second, ShisInday complains that the cumulative effect of errors by appellate counsel requires federal relief (claim 23).[30]

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Under the *Strickland* standard, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of

---

[30]    ShisInday also alleges that trial counsel should have objected more strenuously to testimony and argument suggesting that ShisInday raped the victim (claim 17).  This Court will address that argument with claim 16 that accuses the prosecution of misconduct for adducing testimony about the possible rape.

reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3, (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins*, 539 U.S. at 521.  Instead, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  In reviewing ineffectiveness claims "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight." *Id.* at 689.  An ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]" *Id.* at 689-90.

A petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534.  A reasonable probability is

one that sufficiently undermines confidence in the outcome.  *See Strickland*, 466 U.S. at 689;

*Wiggins*, 539 U.S. at 534.  The Court does not consider prejudice in a vacuum.  "In making

this determination, a court hearing an ineffectiveness claim must consider the totality of the

evidence before the judge or jury."  *Strickland*, 466 U.S. at 695.[31]

A.     Jury Instruction on Voluntary Intoxication (claim 14)

ShisInday's confession indicated that he had been consuming alcohol and drugs before

he murdered the victim.  At the punishment phase of trial, Dr. Robert F. Sarmiento testified

that ShisInday's mental disturbances prevented him from knowing the difference between

right and wrong at the time of the murder.  Tr. Vol. 20 at 80-81.  Dr. Sarmiento did not

attribute his insanity to substance abuse.  Trial counsel requested a jury instruction of insanity

based on Dr. Sarmiento's testimony.  ShisInday argues that trial counsel should have sought

an instruction under TEX. PENAL CODE § 8.04[32] that would have allowed the jury to decide

---

[31]     "It bears repeating that the test for federal habeas purposes is *not* whether [an inmate] made that showing [required by *Strickland*].  Instead, the test is whether the state court's decision – that [the inmate] did *not* make the *Strickland*-showing – was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his IAC claim."  *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003); *see also Busby v. Dretke*, 359 F.3d 708, 717 (5th Cir. 2004) "Of course, in reaching our decision, we must consider the underlying *Strickland* standards."  *Schaetzle*, 343 F.3d at 444.

[32]     TEX. PENAL CODE § 8.04 states that:

(a)     Voluntary intoxication does not constitute a defense to the commission of crime.

(b)     Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried.

(continued...)

that his substance abuse rendered him temporarily insane.  ShisInday contends that trial counsel's failure to request an intoxication insanity instruction was deficient performance that prejudiced his defense.

Under Texas law, "for a defendant to benefit from the provisions of § 8.04, he must do more than merely present evidence of intoxication or even gross intoxication." *Arnold v. State*, 742 S.W.2d 10, 14 (Tex. Crim. App. 1987).  A defendant must "establish 1) that [his] voluntary intoxication caused him not to know his conduct was wrong or 2) that it caused him to be incapable of conforming his conduct to the requirements of the law that he violated." *Hernandez v. Johnson*, 213 F.3d 243, 250 (5th Cir. 2000); *see also Volanty v. Lynaugh*, 874 F.2d 243, 244 (5th Cir 1989); *Tucker v. State*, 771 S.W.2d 523, 534 (Tex. Crim. App. 1988).  The state habeas court reviewed ShisInday's confession indicating that he "drank a six-pack of beer at the complainant's house and a couple of beers from the refrigerator," "they shared a joint," and he "'puffed very lightly' on a second joint."  State Habeas Record at 2148, ¶ 181.  Because of the small quantity of substances ShisInday allegedly consumed, the state habeas court found that ShisInday's "alleged level of intoxication, if any, . . . does not rise to the level of temporary insanity caused by intoxication that would require a jury instruction[.]"  State

---

[32]     (...continued)

(c)     When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury in accordance with the provisions of this section.

(d)     For purposes of this section "intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

Habeas Record at 2148, ¶ 183.  On that basis, the state habeas court concluded that ShisInday's trial attorneys were not ineffective for failing to request an instruction because of "the lack of evidence that [ShisInday] did not know right from wrong as a result of temporary insanity caused by voluntary intoxication."  State Habeas Record at 2184, ¶ 121.  The state habeas court's decision survives review under the AEDPA.

ShisInday's confession showed that he had ingested some drugs and alcohol on the day of the murder.  Even assuming that ShisInday is correct in arguing that "there was sufficient evidence from the confession to infer intoxication played a role in the murder," (Docket Entry No. 18 at 66), he presented no evidence that would show that his intoxication rose to the level of temporary insanity.  ShisInday failed to "put on evidence not simply that he was intoxicated at the time of the offense but that he was insane as a result of the intoxication," thus he cannot complain that he was eligible "to receive a jury instruction on the law of voluntary intoxication as a mitigating factor."  *Hernandez*, 213 F.3d at 244.  Accordingly, ShisInday cannot show that he merits habeas relief from trial counsel's choice not to request an intoxication insanity defense instruction.  *See* 28 U.S.C. § 2254(d)(1).

B.    Cumulative Effect of Appellate Errors (claim 23)

ShisInday makes the cursory argument that his appellate attorney engaged in "cumulatively deficient conduct."  (Docket Entry No. 18 at 105).  ShisInday does not, however, list any individual omission by his appellate attorney, much less aggregate any infractions into a viable cumulative error claim.  Instead, ShisInday makes general statements

about the Sixth Amendment standards and obliquely suggests that he has raised several independent ineffective-assistance-of-appellate-counsel claims in his petition.

On state habeas review, ShisInday faulted appellate counsel for not raising several claims, including his double jeopardy and collateral estoppel arguments. Even assuming that he intends to advance those individual claims again, ShisInday has not shown any error that requires habeas relief. R. P. Cornelius represented ShisInday at trial and on appeal. On appeal, he raised an exhaustive appellate brief raising 54 claims. State habeas counsel reasserted some of those claims and presented additional ones in his state habeas application. ShisInday does not identify any meritorious claim not advanced in state court or any issue otherwise deserving of habeas relief. ShisInday has not specified what deficiencies in his appellate representation would give rise to federal habeas relief. Simply, ShisInday has shown nothing to cumulate. This Court finds that ShisInday has not met his AEDPA burden in refuting the state court's conclusion that appellate counsel provided adequate representation.

**VII.   Alleged Threats Made by the Prosecution Against Zendal Peels (claim 15).**

In 1982, the State of Texas charged Zendal Peels with capital murder for his role in the murder. On November 18, 1982, the State dropped all charges against Peels. In a motion to dismiss, the prosecution described the reason for not prosecuting Peels:

> [Peels] made two statements in this case. The only statement in which [Peels] admitted any culpability in the commission of this crime was inadmissible and was suppressed by the court. This left the State with insufficient evidence that [Peels] was a party to the crime, but instead showed only that [Peels] was

64

present at the scene at the time of the crime.

State Habeas Record at 1333.  The State of Texas has never renewed any charges against Peels.

During ShisInday's second trial, the defense wished to call Peels as a witness. Knowing that Peels would invoke his Fifth Amendment rights, trial counsel asked to have him do so before the jury.  Tr. Vol. 19 at 3-4.  The prosecution objected to calling him before the jury, but had no objection to him invoking his rights out of the jury's presence.  Tr. Vol. 19 at 4-5, 6.  Peels' attorney then appeared and stated that his client would invoke his Fifth Amendment right to remain silent.  Tr. Vol. 19 at 6.  When the defense persisted in wanting to bring Peels before the jury, the trial court held that "you can't call him in front of the jury, you can't comment on why he's not here, either side cannot comment on why he's not here," Tr. Vol. 19 at 8, though the parties could otherwise mention evidence showing his involvement in the murder, Tr. Vol. 19 at 9-10.  The trial court then had Peels stand, identify ShisInday, and invoke his rights.  Tr. Vol. 19 at 13.  Afterwards, the prosecution commented "Just for the record, he does have a Fifth Amendment privilege due to the fact that he had at one time been charged with the offense of capital murder in this case and that case was dismissed and it, also, could be refiled."  Tr. Vol. 19 at 13.[33]

ShisInday alleges that Peels only refused to testify because the prosecution bullied him

_____

[33]     The trial court also denied ShisInday's request to have Peels testify in the punishment phase that the prosecution dropped all charges against him.  Tr. Vol. 23 at 145-46.

with threats of a renewed capital prosecution.  ShisInday argues that "the fact that the State . . . flexed its power to interfere with ShisInday's right to a fair trial is an abuse of its authority and a violation of its obligation to seek the truth."  (Docket Entry No. 18 at 67).  On direct appeal, ShisInday argued that his constitutional rights should have trumped Peels' right not to incriminate himself.  The Court of Criminal Appeals held that "[Peels] informed the court outside the jury's presence that he would invoke his Fifth Amendment privilege against incrimination if called as a witness. [Peels'] assertion of his Fifth Amendment right overrode ShisInday's right to compulsory process of witnesses."  Opinion on Direct Appeal, at 30-31.  When ShisInday reargued this claim on state habeas review, the state court concluded that "the trial court properly refused to allowed [ShisInday] to call Peels to testify in order for Peels to invoke his Fifth Amendment right; Peels' invoking of his Fifth Amendment right overruled [ShisInday's] constitutional right to compulsory process of witnesses."  State Habeas Record at 2170, ¶67.

ShisInday again challenges Peels' ability to exercise his Fifth Amendment rights. Now, however, ShisInday focuses less on whether Peels should have been able to plead the Fifth Amendment, and instead accuses the State of putting Peels in a position which forced him to exercise that right.  "A prosecutor may not intimidate a witness into invoking the Fifth Amendment in order to interfere with a criminal defendant's right to compulsory process." *Brown v. Cain*, 104 F.3d 744, 749 (5th Cir. 1997).  While "substantial governmental interference with a defense witness' choice to testify may violate the due process rights of the

defendant." *United States v. Dupre*, 117 F.3d 810, 823 (5th Cir.1997), "a witness' right against self-incrimination will outweigh a defendant's right to force that witness to testify." *Brown*, 104 F.3d at 749.

ShisInday has not shown that the prosecution acted in any way to force Peels to refuse to testify.  In fact, the only mention of renewed prosecution for the crime was almost an afterthought, made when it was abundantly clear that Peels would not testify.[34]  ShisInday has not shown that the prosecution had any other contact with Peels, much less contact involving threats or coercion.[35]  ShisInday has not shown that the prosecution improperly coerced Peels into refusing to testify.  The state courts, therefore, correctly found that Peels' rights trumped ShisInday's right to a fair trial in this instance.  ShisInday fails to show entitlement to habeas relief under the AEDPA on this claim.  *See* 28 U.S.C. § 2254(d)(1).

## VIII.  Testimony Concerning Possible Rape (claim 16 and 17).

ShisInday argues that the prosecution engaged in misconduct by suggesting that he raped the victim.  ShisInday also argues that trial counsel should have more actively prevented

---

[34]     The state habeas court found that ShisInday "did not request a hearing to determine whether the State had an 'ongoing investigation' of Peels which would serve as basis for Peels asserting his Fifth Amendment rights."  State Habeas Record at 2134, ¶111.

[35]     Moreover, ShisInday has not described how Peels' testimony would be a benefit to him.  ShisInday argues that "[i]t is clear from the statements Peels gave to the police at the time, he was intimately involved in the events surrounding the death of Ms. Harrison."  (Docket Entry No. 18 at 69).  The record is equally clear that Peels' account to the police placed a great deal of the responsibility for the murder on ShisInday.  Further, Peels' police statements indicate that ShisInday confessed to him that he raped the victim and that he killed her to hide that crime.  State Habeas Record at 1318-24.  The Court strongly questions whether such information would have been benefitted the defense.

that information from coming before the jury.  When the prosecution first charged ShisInday with capital murder in 1982, the indictment alleged that he committed a murder in the course of a rape.  The prosecution dropped that allegation before trial.  During the first day of jury selection in ShisInday's second trial, the trial court inadvertently read to the jury the paragraphs of the indictment relying on rape.  Tr. Vol. 3 at 12-13.  The prosecution indicated that it would not seek a conviction based on rape as a precursor to capital murder.

At trial, the prosecution called Dr. Eduardo Bellas, the doctor with the Harris County Medical Examiner's Officer who performed an autopsy on the victim.  During Dr. Bellas' testimony, he explained that there were no injuries on the victim's external genitalia.  Tr. Vol. 18 at 169.  Dr. Bellas testified that he took swabs from the victim's oral, genital, and anal cavity, but only the vaginal cavity contained sperm cells.  Tr. Vol. 18 at 171.  Dr. Bellas testified that he found "abundant . . . seminal fluid material."  Tr. Vol. 18 at 170.  However, the sperm cells had broken down too far to be usable for additional analysis.  Tr. Vol. 18 at 171.  Dr. Bellas also testified that DNA was not a common forensic tool in 1981.  Tr. Vol. 18 at 172.  On cross-examination, Dr. Bellas reiterated that there was no evidence of forced intercourse.  Tr. Vol. 18 at 181-82.  Another expert witness confirmed the presence of sperm cells, but corroborated Dr. Bellas' testimony that they could not be tested for DNA.  Tr. Vol. 18 at 222.  Trial counsel made no objection to the expert testimony that suggested sexual intercourse and possibly rape.

During the penalty phase closing arguments, the prosecution suggested that, in the

68

context of the other evidence and testimony, the evidence of seminal fluid indicated that

ShisInday probably raped the victim:

> And think about.  This man stopped to help her.  He looked nice.  She probably thought at that point in time how lucky I am.  I am so lucky.  Some weirdo didn't stop to help me.  He looked like a normal guy.  That's what makes him so dangerous.  That's what makes him so scary.  You wouldn't see this man coming.  You wouldn't know in the parking lot that she was in, that she – you wouldn't want to leave that parking lot with this man stopping to help you.  You wouldn't have suspected it.  She never did.

> Now, I don't know if she invited him to follow her home to make sure she got home okay or maybe he just offered.  Let me follow you home and make you sure you get home okay.  I do suspect that she wasn't afraid.  And maybe she didn't – maybe she didn't offer at all.  Maybe she didn't ask.  Maybe he just followed her home.  I don't know.  But I do suspect that she wasn't worried, that she thought that it was all going to be okay.

> And then when you get into the house.  When did Sylvia Harrison realize I am not so lucky?  I am not as lucky as I thought I was.  This is not a good deal.  This is what I have always been told about.  This is what my dad's always told me about.  Don't talk to strangers.  When did she realize she was – it was going to be a bad deal?  And you know when you read this statement you know more happens in the house than what's in the statement.  It is the only thing that makes any sense.  Burning the bedroom?  The spermatozoa that was found on the medical exam.  The autopsy report.  Common sense tells you what happened in that house.

> . . .

> But then [ShisInday's statement] goes into how they smoked pot in this statement is what he says.  That's what he says.  It doesn't make any sense because he wants to imply that Zendal has done something.  But then they sit around.  It doesn't make any sense. I submit to you that he and Zendal were in it together.  And I don't have any doubt, I think that the evidence is probably pretty clear, that there was some sort of a rape involved because if not some sort of rape –

Tr. Vol. 25 at 34-36.  The defense objected that the argument was "[o]utside the record."  Tr.

Vol. 25 at 36. The trial court stated: "Ladies and Gentlemen, you will recall the evidence. The lawyer's arguments are not evidence." Tr. Vol. 25 at 36. The prosecution continued:

> You got the statement and only thing that makes any sense because the fire in the bedroom, the fire in the living room, taking her out of the house. Why take her out of the house? Why knock her unconscious and take her out of the house except for something horrible has happened in the house? And you got the physical evidence from the medical examiner's report about sperm and, unfortunately, we didn't have DNA back then or we would know the answer to that question. But I promise you it makes perfect sense of what happened in that house.

Tr. Vol. 25 at 36-37.

On direct appeal, ShisInday complained that the expert testimony and the prosecution's use of that evidence to suggest rape violated state law and the federal constitution. The Court of Criminal Appeals found that ShisInday failed to preserve error for appellate review. Opinion on Direct Appeal, at 39-40, 59. The state habeas court reiterated that procedural finding when ShisInday renewed his claim in his state habeas application. State Habeas Record at 2168, ¶ 57-58; at 2173-74 ¶¶ 79, 82. In the alternative, the state habeas court found that "the State's proper argument was a reasonable deduction from the evidence that [ShisInday] and/or Peels raped the complainant as part of the larger offense of capital murder" and that ShisInday had not proved that the argument "was so extremely or manifestly improper, if at all, so that [he] was deprived of a fair trial." State Habeas Record at 2174, ¶¶ 80-81, 84. Further, the state habeas court found that "the State's argument was properly supported by the evidence of sperm in the complainant's vaginal cavity, the taking and disposing of items from the complainant's house, [ShisInday's] written statement, and the fire

which [ShisInday] and Peels started in the living room and the bedroom of the complainant's house."  State Habeas Record at 2174, ¶ 83.

ShisInday renews his challenges to the admission of, and reference to, evidence showing sexual activity, and possibly rape, sometime before the victim's death.  ShisInday, however, makes no effort to overcome the state courts' procedural bar of this claim.  Absent a sufficient showing of cause and prejudice, this Court cannot grant habeas relief on ShisInday's claims.[36]  Adequate and independent state law forecloses federal consideration of ShisInday's claims relating to evidence and testimony concerning possible rape.

Even if this Court could reach the merits of ShisInday's claims, he has not made a compelling case for habeas relief.  ShisInday has not pointed to any Supreme Court precedent that would have prevented the expert witness from testifying about the condition of the victim's body, and specifically about the "abundant" presence of seminal fluid.  Federal law likewise does not hold that the prosecution's reliance on inferences from the trial evidence violated the Constitution.  "In habeas corpus proceedings, [this Court] review[s] allegedly improper prosecutorial statements under a strict standard."  *Dowthitt v. Johnson*, 230 F.3d 733, 755 (5th Cir. 2000).  A federal habeas court's review of prosecutorial misconduct claims is "'the narrow one of due process, and not the broad exercise of supervisory power.'"  *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416

---

[36]      ShisInday's claim that trial counsel should have objected to the testimony could possibly serve as cause to overcome the procedural bar.  However, for the reasons explained above, ShisInday cannot make an adequate showing of prejudice.

U.S. 637, 642 (1974)).  Accordingly, "'[a] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone.  The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.'" *United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002) (quoting *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989)); *see also Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001); *Ortega v. McCotter*, 808 F.2d 406, 408 (5th Cir. 1987) ("'A prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most egregious cases.'").[37]

While no direct evidence of rape came before the jury, the prosecution did not run far afield in suggesting that a sexual assault possibly occurred. Dr. Bellas testified at trial that the victim's vaginal cavity contained an "abundant" amount of seminal fluid. The victim's body was nude when discovered by the police, though ShisInday explained that they stripped her clothing only immediately before dumping the corpse.  ShisInday and Peels destroyed evidence that may have allowed additional development into the question of whether a rape took place, including by setting fire to the victim's home.  The argument that a rape may have occurred is not outlandish in light of the circumstantial evidence at trial.  The prosecution's reliance on the inferences of rape did not violate ShisInday's constitutional rights.

ShisInday contends that trial counsel should have more actively challenged the rape

---

[37]     Under Texas law, closing arguments must be based on trial evidence, the logical assumptions flowing from that evidence, a response to defense argumentation, or a plea for law enforcement. *See Wilson v. State*, 7 S.W.3d 136, 147 (Tex. Crim. App. 1999).

testimony, thereby preserving the issue for appellate consideration and possibly preventing its admission.  ShisInday has not shown any reasonable manner in which trial counsel could have limited testimony relating to the autopsy.  Further, on habeas review trial counsel submitted an affidavit stating that he "had no accurate recollection of how he viewed the cited jury arguments at the time, but that he prefers to rebut any of the State's unreasonable deductions rather than object, and that an objection sometimes emphasizes an argument more."  State Habeas Record at 2137, ¶ 129.  ShisInday has not shown that trial counsel was ineffective, or that a different result would have been possible had defense counsel more strenuously objected to the insinuations of rape.  ShisInday has not shown an entitlement to relief based on the suggestion that he raped the victim.

## IX.    Trial Testimony About the Exercise of ShisInday's Constitutional Rights (claims 18, 19).

ShisInday contends that the prosecution violated the Constitution by commenting on his exercise of the right to silence and the right to a jury trial.  During the punishment phase, ShisInday called Dr. Robert Sarmiento to explain how factors in ShisInday's childhood impacted his mental health.  In addition, Dr. Sarmiento testified that some of ShisInday's more pronounced mental difficulties such as schizophrenia were in remission or had improved, though some underlying personality traits still caused him problems.  Tr. Vol. 22 at 103.  In conjunction with that testimony and in response to the defense's question of whether ShisInday demonstrated remorse, Dr. Sarmiento testified that

when I saw him before he said that he was sad that the girl had died but that he

73

didn't really take any real responsibility for that.  He blamed Zendal.  He blamed the police.  He blamed his parents.  He blamed society.

And now I think he's really come to realize that he's responsible for his own actions and really to understand why it is wrong to do that.  You know, not just that you get in trouble for it – which is a fairly primitive level of moral development – or in the event that it's illegal, but that the principle behind it. He said the pain that it caused the family and coworkers and everybody that knew the young woman.

So, he understands that that is why it is wrong to do things, to do something like that because of the pain it caused, which is actually a very high level of moral development to understand the principle behind right and wrong, not just the fact that it is wrong but understand why with respect to how it affects other people and so on.

Tr. Vol. 22 at 109-10.  After that testimony, trial counsel passed the witness.  The prosecution then engaged Dr. Sarmiento in the following colloquy:

| The State: | Well, Doctor, on that last point are you saying the defendant has indicated to you that he's responsible for the death of Miss Harrison and accepted the fact that he's the one that caused her death during the kidnapping? |
|---|---|
| Dr. Sarmiento: | Yes. |
| The State: | Then why would he have plead not guilty? |
| Dr. Sarmiento: | Well– |

Tr. Vol. 22 at 110.  Trial counsel immediately objected, arguing that the comment infringed upon ShisInday's right to a jury trial.  The trial court sustained the objected and instructed the jury to disregard the prosecutor's question.  Trial counsel then unsuccessfully moved for a mistrial.  Tr. Vol. 22 at 110-111.

On direct appeal, ShisInday argued that the prosecutor's question infringed on both his

right to a jury trial and on his right to remain silent.  The Court of Criminal Appeals rejected the State's argument that ShisInday invited any error by adducing testimony of his remorse: "[I]t was manifestly improper for the prosecutor to ask why ShisInday decided to plead not guilty."  Opinion on Direct Appeal, at 57.  Even though "the question was improper," the Court of Criminal Appeals found that "the trial court's instruction to disregard cured any error.  Any injury from an improper comment is obviated when the court instructs the jury to disregard, unless the remark is so inflammatory that its prejudicial effect cannot be removed by such an admonishment."  Opinion on Direct Appeal, at 57.  After reviewing the record and relevant state law, the Court of Criminal Appeals found that "the prosecutor's isolated comment during the punishment phase, which was immediately followed by an admonishment to disregard, was not so prejudicial that it could not be cured.  The comment did not reveal to the jury any prejudicial information that it was not already aware of."  Opinion on Direct Appeal, at 58-59.

Again on federal review, ShisInday claims that the prosecution's comment and the trial court's failure to grant a mistrial violated his constitutional rights.  Without question, it is constitutionally unacceptable for a prosecutor to disparage a defendant's exercise of his constitutional rights, particularly his right to silence.  "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978); *see also Griffin v. California*, 380 U.S. 606, 615 (1965) ("[T]he Fifth Amendment . . . forbids either comment by the prosecution on

the accused's silence or instructions by the Court that such silence is evidence of guilt."). The Supreme Court, however, has never held that similar improper prosecutorial comments or questions require an automatic mistrial. Instead, the Supreme Court requires the trial court to inform the jury that it will not consider a defendant's exercise of constitutional rights. *See Carter v. Kentucky*, 450 U.S. 288 (1981).

Here, the trial court promptly instructed the jury to disregard the prosecutor's question. The Court of Criminal Appeals found that the instruction cured any error. Federal law presumes that juries follow their instructions. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). This is not a case where "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of the failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton v. United States*, 391 U.S. 123, 135 (1968). Nothing indicated that the trial court's instruction was somehow insufficient to remove the taint of the improper question. ShisInday has not provided any reason to suppose that the circumstances surrounding the prosecution's question or the general climate of the trial prompted the jury to ignore the trial court's direction. Accordingly, ShisInday fails to meet the AEDPA standard with respect to this claim.

**X.     Introduction of Records Detailing Prior Conviction (claim 20)**.

During the punishment phase of trial the prosecution introduced into evidence criminal judgments against ShisInday for crimes he previously committed. Among the judgments, the

prosecution introduced pen packets detailing: (1) Florida convictions for grand and petit larceny (Exhibit 105) and (2) Louisiana convictions for burglary and attempted escape (Exhibit 106).  Tr. Vol. 31, State's Exhibits 105, 106.[38]  When the prosecution introduced those judgments, ShisInday first objected to Exhibit 106 because it "does not allege a crime that is an offense in the State of Texas, let alone a felony.  It was not even alleging an offense, it doesn't show the safeguards he had a right to a lawyer, he either had a trial or waived a jury trial."  Tr. Vol. 22 at 16.  When the trial court asked if the defense meant that ShisInday "waived a jury and he didn't have a lawyer," trial counsel responded "Yes.  I am saying it doesn't show that he waived a jury or didn't have a lawyer."  Tr. Vol. 22 at 16-17.  Trial counsel did not present any evidence or testimony showing that ShisInday lacked legal representation or did not waive his rights, instead he argued that the judgments did not reflect that the courts protected ShisInday's constitutional rights in those cases.  ShisInday raised a similar challenge to Exhibit 105.  Tr. Vol. 22 at 17.  The trial court allowed evidence of both convictions to come into evidence.  Tr. Vol. 22 at 16-18.

On direct appeal, ShisInday challenged the introduction of the criminal judgments. The Court of Criminal Appeals found that

> [i]n a collateral attack on the judgment of a prior conviction, the burden is on the attacking party to show that the complete records of the cause were silent as to jury waiver or that the state in which the judgment was instated required

---

[38]      The prosecution also presented pen packets detailing ShisInday's convictions in Texas for impersonating a peace officer, revocation of probation, and aggravated assault on a peace officer. Tr. Vol. 31, State's Exhibits 102, 103.  ShisInday's federal petition does not challenge the integrity of those convictions.

>jury waiver to be reflected on the face of the judgment. ShisInday fails to meet
>this burden. He also failed to show that he was without counsel in the prior
>proceedings. In fact, all of the exhibits indicate that ShisInday did have
>counsel.

Opinion on Direct Appeal, at 51 (footnote omitted). ShisInday renewed his claim on state

habeas review.[39]   While noting that it did not have to consider the issue as it had been

adjudicated on direct appeal, the state habeas court alternatively rejected the claim that

ShisInday was without counsel. The state habeas court found that Exhibit 105 "contains an

application and a signed court order for an appointment of a public defendant to represent

[ShisInday]" and Exhibit 106 "recites that [ShisInday's] plea was entered after [ShisInday]

'had the benefit of the advice of counsel.'" State Habeas Record at 2140, ¶ 140; at 2176, ¶92.

The state habeas court also found that ShisInday "fails to show harmful error, if any, based

on the two sentences in [ShisInday's] Florida judgment and sentence[.]" State Habeas Record

at 2177, ¶97.

Federal law prevents the enhancement of an inmate's sentence with convictions

obtained when the inmate lacked legal representation. *See Burgett v. Texas*, 389 U.S. 109,

115 (1967) ("To permit a conviction obtained in violation of *Gideon v. Wainwright* to be used

against a person either to support guilt or enhance punishment for another offense is to erode

the principle of that case. Worse yet, since the defect in the prior conviction was denial of the

right to counsel, the accused in effect suffers anew from the deprivation of that Sixth

---

[39]      On state habeas review, ShisInday also complained that the judgments were too
remote and prejudicial for the jury's consideration. He does not make that argument in his federal
habeas petition.

Amendment right."). Federal law, however, assumes that prior courts have zealously guarded a defendant's rights. *See Sones v. Hargett*, 61 F.3d 410, 420 (5th Cir. 1995) (rejecting the argument that a court "must presume the invalidity of any prior conviction when the evidence supporting it is silent on the issue of representation"). "[A] habeas petitioner has the burden of proving that the convictions used by the State to enhance his sentence were uncounseled." *Mattheson v. Maggio*, 714 F.2d 362, 365 (5th Cir. 1983). In such cases, "the presumption of regularity that attaches to final judgments makes it appropriate to assign a proof burden to the defendant." *Parke v. Raley*, 506 U.S. 20, 31 (1992).

In state court, ShisInday made no effort to prove that he was without counsel or otherwise failed to waive his constitutional rights in the convictions found in State's Exhibits 105 and 106. ShisInday has not provided any clear and convincing evidence on federal review that would call into question the state factfindings on this issue. The challenged criminal judgments do not on their face suggest that ShisInday's constitutional rights were violated, and, in fact, give every indication that counsel represented him in each conviction. As ShisInday bases this claim entirely on speculation, the state courts' denial of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## XI.   Self-Representation on Habeas Review (claim 21).

ShisInday has at various points in his litigation history, including on federal review, sought to proceed *pro se* or in a hybrid representation fashion. He now claims that the state courts violated his constitutional rights by not allowing him to proceed *pro se* in his habeas

action.  Because ShisInday notes that he has a long history of litigating issues himself and feels he could have ably prosecuted the action, he now asks this Court to void the results of his state habeas action and order the initiation of new *pro se* state proceedings.[40]

The Constitution does not require States to make a habeas avenue of relief available, does not guarantee counsel in those proceedings, and provides no due process protection for the regularity of those actions.  *See Coleman*, 501 U.S. at 752; *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).  ShisInday does not identify any Supreme Court precedent that requires a state court to honor an inmate's request to proceed in state habeas without an attorney. ShisInday simply does not show any constitutional basis for his argument.

Even if the Constitution required Texas to allow his *pro se* or hybrid status, no federal habeas remedy exists for the relief ShisInday requests.  The federal habeas writ provides only one remedy – the liberation of an inmate held in violation of the Constitution.  *See Fay v. Noia*, 372 U.S. 391, 430-31 (1963) ("Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him. Indeed, it has no other power . . . ."); *Smith v. Lucas*, 9 F.3d 359, 366 (5th Cir. 1993) ("[T]he writ has but one remedy – to direct the liberation of a state prisoner whose confinement violates federal law.").  This Court has no power to require the state courts to initiate new proceedings, much less when the alleged violation is collateral to an inmate's conviction and

---

[40]    ShisInday, however, does not mention his history of filing frivolous lawsuits.  *See ShisInday v. Texas Dept. of Criminal Justice-Agency*, 124 Fed. App'x. 898, 900 (5th Cir. 2005).

sentence.  This Court cannot provide the relief ShisInday requests.[41]

## XII.   Cumulative Error (claim 22).

ShisInday argues that, taking the cumulative effect of the alleged trial errors and particularly the ineffective assistance of his trial attorneys, he has shown cumulative error that requires habeas relief.  An independent claim based on cumulative error is viable only where "(1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (*en banc*) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  "Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996); *see also Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir.1987) ("Twenty times zero equals zero.").  The state habeas court found no cumulative error.  State Habeas Record at 2152, ¶202; at 2188-89, ¶138.  On federal review, ShisInday has not demonstrated any error of constitutional magnitude at his trial.   In short, ShisInday "has presented nothing to cumulate." *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993).  Accordingly, ShisInday cannot show that the state court finding of no cumulative error was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

---

[41]     ShisInday first raised this issue in his amended petition which he filed well after the AEDPA's limitations period expired.  Relying on *Mayle v. Fenix*, ___ U.S. ___, 125 S. Ct. 2562 (2005), Respondent argues that this Court should not consider this claim because it is time barred. Because no federal habeas relief exists for this claim, the Court need not address the time-bar issue.

### XIII.   Exemption from Execution Due to Mental Illness (claim 24).

ShisInday contends that his execution would violate the Constitution's cruel and unusual punishment clause because of his history of mental illness and mental disorders. ShisInday cobbles together state, federal, and international law to argue that the evolving standards of decency that guide Eighth Amendment law prohibit capital punishment for the insane.   Primarily, ShisInday sees the Supreme Court's exemption from execution of the mentally retarded in *Atkins v. Virginia*, 536 U.S. 304 (2002), and of juveniles in *Roper v. Simmons*, 543 U.S. 551 (2005),  as milestones along a path that leads to the same exemption for mentally-ill offenders.   ShisInday asks: "If the diminished culpability associated with youth and mental retardation render the death penalty an excessive punishment when used against offenders from those categories, should not defendants suffering from serious mental disorder[s] other than retardation, also be ineligible for execution?"  (Docket Entry No. 18 at 108).

ShisInday did not present this claim in state court.  As ShisInday completely failed to raise his challenged claims in state court, and Texas would find any belated attempt to raise them an abuse of the writ, procedural law bars federal consideration of their merits.  Yet, even if ShisInday presented his exemption-from-execution claim in a procedurally adequate manner, he still does not make a meritorious argument for relief.   No precedent extends exclusion from execution in the manner ShisInday requests.  *See In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006) (finding that *Atkins* did not exempt mentally ill inmates from execution);

82

*In re Woods*, 155 Fed. App'x 132, 136 (5th Cir. 2005) (same).  ShisInday asks this Court to find that an emerging accord exists that would make the execution of the insane violate standards of decency, yet fails to square that argument with the prohibition against the creation of new law on habeas review found in *Teague v. Lane*, 489 U.S. 288 (1989).  Even had ShisInday raised this claim in state court, this Court finds that he has not demonstrated entitlement to federal habeas relief.

**XIV.  Prolonged Stay on Death Row (claim 25).**

ShisInday contends that his quarter of a decade on death row should liberate him from his sentence.  ShisInday gathers together law from around the world to justify his claim that psychological pressure suffered by those awaiting death amounts to a cruel and unusual punishment.  The Fifth Circuit has rejected the claim that the length of time before an inmate's execution violates the Constitution.  *See White v. Johnson*, 79 F.3d 432, 439 (5th Cir. 1996); *Lackey v. Scott*, 52 F.3d 98 (5th Cir. 1995).  *Teague*'s non-retroactivity principle prevents this Court from granting relief on this claim.

**CERTIFICATION OF ISSUES FOR APPEAL**

Although ShisInday has not yet requested that this Court grant him a Certificate of Appealability ("COA"), this Court can consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  Under the AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a COA.  28 U.S.C. § 2253(c).  "The COA statute establishes procedural rules and requires a threshold inquiry

into whether the circuit court may entertain an appeal." *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Supreme Court has explained the standard for evaluating the need for a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §§ 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  On the other hand, a district court which has denied a habeas petition on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  Unless the prisoner meets the COA standard, "no appeal would be warranted."  *Slack*, 529 U.S. at 484.

Under the appropriate standard, ShisInday has not shown that this Court should certify any issue for appellate consideration.  This Court denies ShisInday a COA on all the claims raised by his petition.

## CONCLUSION

"Though the penalty is great and our responsibility heavy, our duty is clear." *Rosenberg v. United States*, 346 U.S. 273, 296 (1953) (Clark, J.). For the reasons described above, the Court finds that ShisInday has not shown entitlement to federal habeas relief. The Court **GRANTS** Respondent's motion for summary judgment. This Court **DENIES** ShisInday's petition and **DISMISSES** all ShisInday's claims **WITH PREJUDICE**. No Certificate of Appealability will issue in this case.

Signed at Houston, Texas on March 9, 2007.

Gray H. Miller
United States District Judge

85